**HEWLETT–PACKARD
COMPANY, Plaintiff,**

v.

**BAUSCH & LOMB, INC., Defendant.**

**No. C–84–20642 RPA.**

United States District Court,
N.D. California.

July 22, 1988.

James P. Kleinberg, McCutchen, Doyle, Brown & Enersen, San Jose, Cal., Jon R. Stark, Holme Roberts & Owen, Denver, Colo., Jonathan A. Marshall, Pennie & Edmonds, New York City, for plaintiff.

Anne L. Enea, Ferrari, Alvarez, Olsen & Ottoboni, San Jose, Cal., Bernard D. Bogdon, Bausch & Lomb Inc., Rochester, N.Y., James W. Colbert, III, O'Melveny & Myers, Lawrence H. Pretty, Pretty, Schroeder, Brueggemann & Clark, Los Angeles, Cal., for defendant.

## AMENDED ORDER RE AFFIRMATIVE DEFENSE OF INEQUITABLE CONDUCT

AGUILAR, District Judge.

### I. INTRODUCTION.

This action went to trial on April 5, 1988. The case involves a suit by plaintiff Hewlett–Packard Company ("HP") for a judicial declaration that it has not infringed defendant Bausch & Lomb, Inc.'s ("B & L") United States Reissue Patent No. 31,684 (the "Yeiser reissue patent"). B & L has counterclaimed for infringement. In support of its position, HP has raised the affirmative defense of inequitable conduct. Specifically, HP contends that B & L committed inequitable conduct before the patent office

in procuring the Yeiser reissue patent. This alleged inequitable conduct primarily consisted of the submission of two declarations and two affidavits in support of the reissue application which B & L knew (or absent grossly negligent conduct, should have known) contained blatantly false information.

Shortly before trial, HP filed a motion for summary judgment arguing that because the two affidavits submitted by B & L in obtaining the Yeiser reissue patent were false and were essential to the patent examiner's ruling, the reissue patent is invalid. The motion was granted from the bench on March 18, 1988. The Court ruled that Yeiser reissue. patent claims 10–12 were invalid due to the falsity of the affidavits, but the Court refused at that point to nullify claims 1–9 of the reissue patent which were carried over substantially unchanged from the original and untainted patent application. On that same day, the Court *sua sponte* asked the parties to brief the issue of whether and under what circumstances a district court could nullify all the claims of a reissue patent in light of egregious misrepresentations contained in materials supporting an application for a reissue patent.

After a two week briefing schedule, on April 1, 1988, the Court heard oral argument on the motion for summary judgment as against claims 1–9 of the reissue patent. At the conclusion of the argument, the Court denied the motion for summary judgment finding that there remained a triable issue of material fact. Specifically, there remained a factual question whether B & L intentionally deceived the United States Patent and Trademark Office ("PTO") or was grossly negligent in seeking and gaining the Yeiser reissue patent.

Subsequently, on the morning of the opening day of trial, April 5, 1988, the Court issued a brief order stating its rulings on the various motions raised by the parties and setting forth the schedule for trial. In the order, the Court stated that a fuller explanation of the bases of its rulings would issue at the conclusion of the trial of HP's affirmative defense of inequitable conduct by B & L in obtaining the Yeiser reissue patent. In the sections that follow, the Court will set forth its findings and analysis in connection with its prior rulings; will describe the legal issues presented by HP's affirmative defense of inequitable conduct vis-a-vis the reissue application; and will make findings of fact and state conclusions of law with respect to the merits of HP's assertion of inequitable conduct against B & L. As explained below, the Court will declare unenforceable all remaining claims of the Yeiser reissue patent because of B & L's inequitable conduct before the PTO.

## II. HP'S MOTION FOR SUMMARY JUDGMENT BASED ON B & L'S FAILURE TO COMPLY WITH THE "REISSUE OATH OR DECLARATION" REQUIREMENT.

### (A) *Preface:*

In this motion, HP seeks a judicial declaration that the Yeiser reissue patent is invalid.[1] The alleged basis for invalidity is that B & L made factually incorrect representations to the patent examiner when seeking a reissue of its original patent. Because the representations were incorrect, as proved by later evidence which was submitted to the Court in connection with this motion, HP contends that the representations should be ignored. Absent the representations, B & L cannot be said to have complied with the regulations regarding reissue applications because B & L did not present evidence to the patent examiner explaining why and how the original patent application was flawed. Without such evidence, the patent examiner could not have authorized the reissue application and, therefore, the Yeiser reissue patent is invalid as a matter of law.

B & L's defense to this motion is two-fold. First, B & L argues that as a matter of law the nine claims of the original patent which are identical to and not affected by

---

1. For a discussion of the semantic distinction between "unenforceability" and "invalidity," *see* *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1560–61 (Fed.Cir.1984).

the reissue application should not be nullified.[2] Second, B & L contends that there are material issues of fact regarding the alleged misrepresentations as they affect the three claims added by the reissue patent application.

(B) *An Overview of the Reissue Process:*

Reissue is one of four ways that a defective patent may be remedied. The other three ways are (1) by the issuance of a certificate of correction, (2) by disclaimer, and (3) by reexamination. *See Manual of Patent Examining Procedure* (5th ed. 1983) at 1400-1. The most common grounds for seeking to reissue a patent are (1) claims are too narrow or too broad; (2) the disclosure contains inaccuracies; (3) applicant failed to or incorrectly claimed foreign priority; and (4) applicant failed to make reference to or incorrectly made reference to prior co-pending applications. *Id.*

The framework and procedure for the reissue of patents such as the Yeiser reissue patent in this case is governed by statute. The key patent reissue statute is 35 U.S.C. § 251 which provides in relevant part:

> Whenever any patent is, through error without any deceptive intention, deemed wholly or partly inoperative or invalid, by reason of a defective specification or drawing, or by reason of the patentee claiming more or less than he had a right to claim in the patent, the Commissioner shall, on the surrender of such patent and the payment of the fee required by law, reissue the patent for the invention disclosed in the original patent, and in accordance with a new and amended application, for the unexpired part of the term of the original patent. No new matter shall be introduced into the application for reissue.

The concept employed in the reissue statute is that the inventor takes his patent to the patent examiner for a second look to clarify and amend any deficiencies. *See In Re Weiler,* 790 F.2d 1576, 1579 (Fed.Cir. 1986) ("Congress provided a statutory basis for correction of 'error' "). A clear explanation of this process is provided in the following passage from *Bally Mfg. Corp. v. Diamond,* 629 F.2d 955, 957 (4th Cir. 1980):

> The reissue process traditionally has provided a mechanism whereby an inventor who, through error and without any deceptive intention, has been granted a defective patent, may obtain a valid patent conforming to the true scope of his invention. Ordinarily, the patentee submits his previously issued patent, 37 CFR § 1.178, and files an affidavit stating the reason he believes it to be wholly or partly invalid, 37 CFR § 1.175. He also is required to file a reissue application containing the entire specification and claims of the original patent, with proposed deletions bracketed and proposed additions underlined, 37 CFR § 1.173. A patent examiner reexamines all claims included in the reissue application as if they were presented in an original application, 37 CFR § 1.176. If he finds the previously issued patent "wholly or partly inoperative or invalid", 35 USC § 251, the examiner determines whether the applicant is entitled to a patent under the reissue claims. If a reissue is refused, whether because the previously issued patent is entirely valid or because the reissue claims do not describe a patentable invention, the original patent will be returned to the applicant upon his request, 37 CFR § 1.178. Reissue patents are entitled to the same presumption of validity as original patents. [citations omitted]

*See also* 4 Lipscomb's *Walker on Patents* (3d ed. 1985) § 14.1.

The actual procedure used in reissuing patents is contained in the Code of Federal Regulations. See 37 C.F.R. §§ 1.171–1.179 (July 1987). The current regulations are slightly different than those in effect at the time that B & L made its reissue applica-

---

**2.** During reissue, the patent examiner required B & L to correct a typographical error in claim 3. This alteration did not affect the substantive identity between the original claim 3 and reissue claim 3. *Slimfold Mfg. Co. v. Kinkead Industries,* 810 F.2d 1113, 1115 (Fed.Cir.1987). All other claims remained identical in both applications.

tion. As suggested above in the case of *Bally Mfg. Corp.*, 629 F.2d 955 (4th Cir. 1980), in seeking a reissue patent the inventor is basically initiating anew the patent process, starting with his original patent, indicating its errors, and applying to make specific corrections. One aspect of the reissue process that is unique, however, is the inclusion of a reissue oath or declaration by the applicant stating specific details regarding the grounds for seeking a reissue. At the time of B & L's application, the regulations regarding the oath or declaration read as follows:

§ 1.175 Reissue oath or declaration.

(a) Applicants for reissue, in addition to complying with the requirements of the first sentence of § 1.65, must also file with their applications a statement under oath or declaration as follows:

(1) When the applicant verily believes the original patent to be wholly or partly inoperative or invalid, stating such belief and the reasons why.

(2) When it is claimed that such patent is so inoperative or invalid "by reason of a defective specification or drawing," particularly specifying such defects.

(3) When it is claimed that such patent is inoperative or invalid "by reason of the patentee claiming more or less than he had the right to claim in the patent,"

distinctly specifying the excess or insufficiency in the claims.

(4) [Reserved]

(5) Particularly specifying the errors relied upon, and how they arose or occurred.

(6) Stating that said errors arose "without any deceptive intention" on the part of the applicant.

(7) Acknowledging a duty to disclose information applicant is aware of which is material to the examination of the application.

(b) Corroborating affidavits or declarations of others may be filed and the examiner may, in any case, require additional information or affidavits or declarations concerning the application for reissue and its object.[3]

(C) *The Legal Authority to Invalidate a Reissue Patent For Failure to Comply With Regulatory Standards:*

HP's argument in this motion is that the Yeiser reissue patent is invalid because it was based on factual misstatements or misrepresentations made in the statements provided in satisfaction of 37 C.F.R. § 1.175. The critical statements provided to the patent examiner in support of the reissue application were two affidavits of the original patent agent, Lawrence Fleming.[4] The patent examiner relied on these

---

**3.** An exegesis of the oath requirement is contained in the *Manual of Patent Examining Procedure* (the "MPEP") which is published by the United States Patent and Trademark Office and serves as *the* authoritative reference for patent examiners and others working in the field. The relevant text of the MPEP as it existed at the time B & L pursued their reissue application stated:

> 1414.03 Requirements of § 1.175(a)(5)
> All reissue oaths or declarations must comply with subsection 1.175(a)(5) ... by "particularly specifying the errors ... relied upon, and how they arose or occurred." Subsection 1.175(1)(5) has two specific requirements, both of which must be complied within, or by, the reissue oath or declaration. This subsection requires applicant to particularly specify (1) "the errors ... relied upon" and (2) "how they arose or occurred."
> * * * * * *
> It is particularly important that the reissue oath or declaration specify in detail how the errors ... arose or occurred. "How" includes

when and under what circumstances the errors ... arose or occurred. This means that the reissue oath or declaration must specify the manner in which "... errors" "arose or occurred." ... If the reissue oath or declaration does not particularly specify "how," i.e., the manner in which ... errors arose or occurred, the Office will be unable to adequately evaluate reissue applicant's statement in compliance with § 1.175(a)(6) that the "errors ... arose 'without any deceptive intention' on the part of the applicant"[.]

**4.** John Yeiser was the inventor of the "X–Y Plotter" described in U.S. Patent No. 3,761,950 (the '950 patent). At the time he conceived of the subject matter of the '950 patent, Yeiser was a principal in a business which made and sold strip chart recorders and X–Y recorders. Yeiser filed his application for a patent in August 1970. During the pendency of the patent application, Yeiser's business relationship changed and the patent was issued to the Milton Roy Company of St. Petersburg, Florida, on September 25, 1973. In May 1982, B & L bought the '950

affidavits to reissue the patent. However, HP now contends that discovery has disclosed that all material statements made in the Fleming affidavits were erroneous.

Absent these factual misstatements, B & L had nothing of substance to report to the patent examiner. Without evidence explaining how the asserted error arose or occurred, B & L failed to satisfy the reissue oath regulations. HP succinctly stated this logic in one section of its moving brief:

> To decide the present motion, this Court need investigate *only* the limited issue of whether the Fleming affidavits misstated material facts as to how the error arose or occurred. An affirmative finding on that issue means that there were *no facts* in the PTO record in support of the defective reissue Declaration upon which the examiner could have made the mandated determination that the Yeiser reissue application was proper. Consequently, under the applicable rule of law, the PTO was without authority to grant the reissue, and the Yeiser reissue patent is void.

*HP Moving Brief* at 4 (emphasis in original).

■ B & L counters this argument with several contentions of its own. First, B & L asserts that there is no precedential support for judicial nullification of a reissue patent for lack of satisfaction of the oath/declaration requirement. This assertion is wrong, as demonstrated by the cases cited by HP. In *Application of Wittry,* 489 F.2d 1299, 1303 (C.C.P.A.1974), the predecessor of the Federal Circuit affirmed the denial of a reissue patent on the ground of "insufficiency of the reissue declarations." HP also cites five other cases in support of the proposition that a court may declare a reissue patent void for failure to comply with the requirements attendant to the reissue statute or regulations. *Union Switch & Signal Co. v. Louisville Frog, Switch & Signal Co.,* 73 F.2d 550 (6th Cir.1934); *Firestone Tire & Rubber Co. v.*

*United States Rubber Co.,* 79 F.2d 948 (6th Cir.1935), *cert. denied,* 298 U.S. 679, 56 S.Ct. 945, 56 S.Ct. 946, 80 L.Ed. 1399 (1936); *General Radio Co. v. Allen B. DuMont Laboratories, Inc.,* 129 F.2d 608 (3d Cir.1942), *cert. denied,* 317 U.S. 654, 63 S.Ct. 50, 87 L.Ed. 526 (1942); *Dill Mfg. Co. v. J.W. Speaker Corp.,* 83 F.Supp. 21 (E.D. Wis.1949), *aff'd.,* 179 F.2d 278 (7th Cir.), *cert. denied,* 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601 (1950). These cases are not particularly recent, but they do support HP's position.

■ Aside from the litany of cases discussing the particular problem, it makes sense that a court should be able to invalidate a reissue patent if it was improvidently granted. This is certainly true when an original patent is found to be procured as a result of fraud or inequitable conduct, or when the patent was issued despite a failure to satisfy the statutory requirements, such as non-obviousness. *See, e.g., Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *State Industries, Inc. v. Rheem Mfg. Co.,* 769 F.2d 762, 764 (Fed.Cir.1985). The same must be true with respect to reissue patents. Inequitable conduct implicating a material aspect of a reissue application is grounds for nullification of a patent. *See, e.g., Keystone Driller Co. v. General Excavator Co.,* 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); *State Industries, Inc. v. Rheem Mfg. Co.,* 769 F.2d 762, 764 (Fed.Cir.1985).

Similarly, if the standards of the statute or implementing regulations are not met, "section 251 stands as a statutory bar to reissuance of claims, just as sections 102 and 103 might stand as a bar to the issuance of claims." *Digital Equipment Corp. v. Diamond,* 653 F.2d 701, 710 (1st Cir.1981). On review, a district court must have the authority to enforce the statutory bar of § 251 in the same degree as it enforces the bars to patent validity articulated in § 102 (dealing with novelty and loss of right to patent) and § 103 (dealing

patent from the Milton Roy Company for $30,000. On November 15, 1982, B & L filed an application with the PTO for a reissue of the '950 patent. After a protracted proceeding

that is more fully discussed below, the Yeiser reissue patent was granted on September 25, 1984.

with non-obviousness of subject matter). Thus, this Court has the authority to review a reissue patent for purposes of determining its validity in light of alleged deficiencies or improprieties in its procurement.

The next question is the character of the district court's review of the validity of the reissue patent. As quoted earlier, HP's argument is that once the Court finds that Mr. Fleming's affidavits are factually erroneous, and concludes that there was no basis in the record before the patent examiner for granting the reissue application, the Yeiser reissue patent should be declared invalid. B & L offers a clever rejoinder. B & L contends that the very cases cited by HP establish that the district court must determine on the merits whether there was reissuable error. In other words, even if the reissue application itself was deficient, are there facts going to show that there was an error that formed a legitimate basis for a reissue application?

In support of its assertion, B & L relies on a passage from the Third Circuit's opinion in *General Radio Co.:*

> Whether the error relied upon in support of an application for reissue was due to inadvertence, accident or mistake is of course a question of fact for determination by the commissioner. [footnote omitted] By granting the reissue patent the commissioner must be deemed to have found the fact in favor of the applicant. However, where there is an entire absence of evidence, it is the duty of the court to review and correct the error.

129 F.2d at 612, *citing Union Switch*, 73 F.2d .550 (6th Cir.1934).

Upon first glance, this quotation seems to support B & L's position that even if the Fleming affidavits are eliminated as erroneous or false, the Court still must make an independent determination now of whether there were grounds for a reissue error under 35 U.S.C. § 251.[5] However, B & L is incorrect for reasons that it itself has pointed out. B & L has argued that all of the cases cited by HP, including *General*

*Radio*, involve "reissue oaths or declarations [that] *literally* were bald assertions of reissuable 'error.'" *B & L Opposition Brief* at 16. (emphasis in original). In contrast, the patent examiner in this case did not have "an entire absence of evidence" to determine whether a reissue error existed—he had the affidavits of Mr. Fleming which were not devoid of specifics. Indeed, B & L vociferously argues this point late in its brief. *See Opposition Brief* at 28 (section entitled "The Fleming Affidavits Would Have Been Adequate With Far Less Detail"). Thus, unlike the oath in *General Radio*, the affidavits in this case did contain some specifics and the above language in *General Radio* is not applicable to this case.

In addition, the court in *General Radio* was reviewing a reissue patent that had been granted despite "an entire absence of evidence." 129 F.2d at 612. Yet by granting the reissue, "the commissioner must be deemed to have found the facts in favor of the applicant." *Id.* In such circumstances, the court stated that it had the duty of attempting to ascertain what those facts were that presumably supported the applicant and formed the basis of the reissue approval. In essence, this is an expression of deference to the Commissioner of Patents and Trademarks, *i.e.*, the court will not strike down a reissue patent until it has scrutinized the evidentiary basis for the patent examiner's decision.

In this case, there is no mystery about the nature of the evidence that formed the basis of the patent examiner's decision. It is clear that Mr. Fleming's affidavits were crucial evidence upon which the patent examiner relied in making his determination. In reviewing the reissue patent, a court need only consider the evidence that was before the patent examiner. In this case, that evidence consists primarily of Fleming's affidavits. Hence, B & L's reliance on *General Radio* is misplaced, for the decision squarely supports HP's position.

---

5. B & L contends: "Only after the court sustains the defense on the merits can it be said that, had the same facts been presented to the Commissioner, no authority would have existed for [re]issuing the patent." *B & L Opposition Brief* at 18.

Aside from its case-law argument, B & L offers one other point of resistance to HP's logic. B & L contends the cases cited by HP are distinguishable from and their logic inapplicable to this case because none of the cases involve a situation wherein the reissue oaths or declarations appeared adequate on their face. Although not spelled out clearly, B & L appears to argue that once a *prima facie* case of a valid oath is established, then the patent examiner had the authority to grant the reissue application. According to B & L, in litigation contesting the validity of the reissue patent, the challenger has the burden of showing that on the true state of facts, a reissuable error did not exist. Thus, HP would have the burden here of establishing that as a matter of fact there were no grounds for the patent examiner's conclusion to grant the reissue patent.

Despite its sophistication, there are two major problems with B & L's argument. First, there is no case law or clear statutory law supporting this position. This silence speaks for itself. Second, B & L has confused the allocation of the burden of proof relative to the issue of invalidity.

As the regulations make clear and as expressed in the cases, the applicant "who wishes to obtain the benefits of the reissue statute must make a specific showing of the circumstances" that led to the error. *General Radio*, 129 F.2d at 612; *see also* 35 C.F.R. § 1.171 ("An application for reissue must ... comply with the requirements of the rules relating to reissue applications.") The burden in the first instance is on the applicant properly to obtain a reissue patent, the same as it is was on the applicant in originally procuring a patent. Once a patent is issued, the burden is on the challenger to establish invalidity by "clear and convincing evidence." *Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 (Fed.Cir.1985); 35 U.S.C. § 282.

The same standard applies with respect to reissue patents except the standard for showing invalidity is heightened by the quantum of weight given to a second examination and approval by the PTO. *See Interconnect Planning Corp. v. Feil*, 774 F.2d 1132, 1139 (Fed.Cir.1985).

In a reissue case as in any patent case, it is not necessary for the party seeking to prove invalidity to revisit the entire patent application process and show that there is no way on earth that a patent could have issued. Rather, it is enough to show that with respect to the specific patent, or reissue patent, any one statutory requirement has not been satisfied. In the case of a patent, for example, invalidity naturally flows from a showing that the patented invention was obvious, or was previously disclosed. To make this determination, the district court would examine all the information presented to the patent examiner plus any additional information that has come to light on the subject of obviousness. There is no need to unearth and examine all the other potential grounds for invalidity.

Similarly, in this case, to demonstrate invalidity it is enough for HP to show, by clear and convincing evidence, that B & L failed to satisfy the legal oath or declaration requirement. The Court can make the determination whether HP is correct by reviewing the evidence presented to the patent examiner. B & L has the burden of establishing grounds upon which an error could be found as the cause of its failure to frame properly its original patent application. *See In Re Weiler*, 790 F.2d 1576, 1582–83 (Fed.Cir.1986).[6]

To sum up, B & L has the burden of showing reissuable error. In view of the patent examiner's finding of reissuable error, the burden is on HP to show that the

---

6. The Federal Circuit in *In Re Weiler* also noted that the applicant's "reliance on allegations of the inventor's ignorance of drafting and claiming technique and counsel's ignorance of the invention is unavailing. Those allegations could be frequently made, and, if accepted as establishing error, would require the grant of reissues on anything and everything mentioned in a disclosure. [Applicant] supplies no facts indicating how the ignorance relied on caused any error as the basis of his failure to claim the subject matter" in dispute. On this basis, the court affirmed the denial of the reissue application as to the claims in question. *In Re Weiler*, 790 F.2d at 1583 n. 4.

patent examiner was wrong. However, that is not the end of the process. B & L is correct that normally it is not enough to simply look at the affidavits, find them lacking, and declare the reissue patent invalid. B & L must be given an opportunity to prove reissuable error by other evidence presented to the PTO during the original application. This is little solace to B & L because no other evidence was presented to the patent examiner showing reissuable error.

(D) *Was B & L's Reissue Application Obtained Improperly?*

The Yeiser reissue application process is discussed in more elaborate detail below in connection with the topic of inequitable conduct. For purposes of HP's motion, only one issue is relevant: were the oaths or affidavits submitted by B & L to the PTO in support of the reissue application insufficient or false?

In support of its reissue application, on November 15, 1982, B & L submitted the declaration of its Vice President, George More. The More declaration stated that the defect in the original patent application was a failure to include claims dependent on claim 1. The alleged basis for the error was simply "oversight" by Mr. Yeiser or his attorney. More provided no other explanation for the omission.

Quite properly, the patent examiner rejected the More declaration as insufficient because it failed "to specify the errors relied upon" or to "specify how the error arose or occurred." Exh. 44, PX 19, Tab 7. In particular, the patent examiner stated:

> The declaration is ... insufficient because it does not specify how the error arose or occurred. The statement that the alleged errors occurred or arose because of oversight on the part of the inventor or his attorney does not specify in detail how and why such an oversight occurred. A declaration from the original attorney may be in order.

Thus, the patent examiner clearly and properly stated that the declaration of Mr. More submitted to satisfy the oath requirement was insufficient under 37 C.F.R. § 1.175(a)(5).

In response to patent examiner's rejection, on September 14, 1983, B & L submitted the affidavit of Lawrence Fleming, the patent agent responsible for procuring the original patent. Relevant portions of the first Fleming affidavit follow:

3. During the preparation and prosecution of [the original] Patent Application ..., *his [Fleming's] contacts and ability to communicate with the inventor, Mr. Yeiser, were significantly limited by Mr. Yeiser's activities* ... His *contacts with Mr. Yeiser* during the prosecution of the application *were at best infrequent.*

4. The *only guidance* given the undersigned by Mr. Yeiser during the preparation and prosecution of [the original Yeiser application] was a memorandum dated July 7, 1970. ... *[T]he memorandum is silent as to what scope and breadth of claims should or could be obtained.*

5. His only contact with L.D.C. Inc. [the assignee of the application and Yeiser's employer], was Mr. R.J. Tarantino, its President, ... but ... *Mr. Tarantino [did not provide] any substantive help or guidance* to him during the prosecution of the patent application ...

6. The aforesaid business and personal activities of the inventor, Mr. Yeiser, and his assignee worked, inadvertently, to substantially cut off intercommunication with the undersigned. Had further communications and guidance been received, it is his belief that claims which further define and distinguish the invention from the prior art could have been drafted and allowed. [emphasis added]

After consideration of B & L's second submission, the patent examiner again properly rejected B & L's application. Again, the patent examiner found that B & L had not specified "a reissuable error." Exh. 44, PX 19, Tab 17. For purposes of this motion, the crucial finding, however, was that:

> The reissue oath or declaration filed with this application is objected to because it fails to particularly specify how the errors relied upon arose or occurred, as required by 37 CFR § 1.175(a)(5). The declaration states the errors occurred be-

cause of oversight on the part of the inventor or his attorney in connection with the preparation and prosecution of the application. The declaration is considered deficient *because* it does not particularly specify *how the errors arose. How and when* did the errors arise? For example, *who determined the scope of the original claims to be submitted with the patent application? Who determined the final scope of the patent claims? When* were these determinations performed? The declaration is *also* considered *deficient* as to *how and when* the errors were discovered. For example, *by whom and when* was it determined that an error had occurred. (emphasis added)

It is clear that the patent examiner had a valid and proper basis for rejecting the first Fleming affidavit. Under 37 C.F.R. § 1.175(a)(5), Fleming had not explained how the error arose. Absent a specific explanation, the affidavit was insufficient as a matter of law.[7]

On November 22, 1983, one of B & L's attorneys, Howard Robbins, interviewed the patent examiner to clarify the basis for the rejection of the first Fleming affidavit. Subsequently, on March 27, 1984, B & L submitted the second ("supplemental") affidavit of Lawrence Fleming. The relevant text of the affidavit stated:

4. The inventor, Mr. Yeiser, had made one crude model of the invention and this model was made available for him to review, on only one occasion for about two hours, to effect disclosure of the invention.

5. The *scope of the claims* for U.S. Patent No. 3,761,950 *was determined solely by him, based upon this brief disclosure and his knowledge and experience as an engineer and patent practitioner.* In making this determination concerning the scope of the claims *no*

discussions were had with Mr. Yeiser as a result of the events explained in his Affidavit of September 14, 1983.*[8]

6. He was well acquainted with Mr. Yeiser at the time the application for U.S. Patent No. 3,761,950 was written and prosecuted, having previously drafted and prosecuted several patent applications for inventions by Mr. Yeiser. Based upon this close acquaintanceship, he believes *Mr. Yeiser was not cognizant of the significance of several aspects of the invention* embodied in U.S. Patent No. 3,761,950, because only one crude model existed from which all aspects of the invention could not be appreciated, and because Mr. Yeiser, having just sold his business, no longer had a commercial interest in plotters and ... *was left to and did himself determine* what scope and breath [sic] of claims should and could be obtained. (emphasis added)

Finally, on April 17, 1984, in response to B & L's final submission, the patent examiner withdrew his prior objections to the application for reissue of the '950 patent. The patent examiner stated that the "original Declaration has been reconsidered together with the Supplemental Fleming Affidavit. They are [now] considered sufficient Declaration under 37 CFR [§] 1.175." Exh. 44, PX 19, Tab 26. Thus, it was the second Fleming affidavit which overcame the patent examiner's objections and was found to satisfy the oath requirement of the regulations. The question raised here is whether that affidavit was accurate.

(E) *The Truth Regarding Fleming's Contacts With Yeiser and the Other Points in Support of Reissuable Error Raised in the Fleming Affidavits:*

HP points out several discrepancies in Fleming's affidavits which essentially void

---

**7.** It is worth noting that despite its deficiencies, the first Fleming affidavit was not a total loss. The patent examiner did rely upon and accept a portion of Fleming's statement:

The Fleming Affidavit states that the contacts and ability to communicate with the inventor by the agent who prepared the application were significantly limited. *It is acceptable on*

*this point.* It is *not acceptable* however as to *how and by whom the scope of the subject matter claimed was determined and why.*

**8.** The "events" referred to were "Yeiser's activities" which caused Fleming's "contacts" during the critical period to be "at best infrequent." PX 19, Tab 4.

them as a basis for the patent examiner's finding of reissuable error. HP's premise, which is amply supported by the facts, is that these affidavits were *the keys* to the grant of the reissue patent. There is no question that these affidavits secured the reissue patent for B & L. Thus, if HP can refute the Fleming affidavits, in particular the second one, B & L will be left without reissue claims because the patent examiner had *no other basis* to grant a reissue patent. The four main points made by HP are that:

(1) Fleming had numerous contacts with Yeiser during the pendency of the reissue application;

(2) Yeiser was aware of the importance of the "friction drive" and provided material help and guidance in formulating the scope of the reissue claims;

(3) LDC executive Tarantino was consulted on numerous occasions during the pendency of the application; and

(4) Yeiser spent a significant amount of time during the critical period in personally developing the commercial version of his device.

HP has obtained Fleming's notebooks kept during the time period in question.[9] Although ostensibly undecipherable to this Court's eye, the parties agree that these records show that Fleming and Yeiser met in person, spoke on the phone, or exchanged correspondence sixty seven (67) times during the period of preparation and prosecution of the original patent application. B & L does not deny these contacts. This revelation destroys Fleming's claim in his affidavit that he and Yeiser, the inventor, had limited contacts during the creation of the patent application.

In addition, there are several pieces of evidence showing that Yeiser and Fleming had discussions about the patent application beyond the July 7, 1970 memorandum which the Fleming affidavit reported to be the "only guidance" given by Yeiser. Fleming and Yeiser spoke on the phone (PX 368, Fleming deposition at 356–57), Yeiser read the patent application in Fleming's presence (PX 368, Fleming deposition at 453), and the two men discussed prior art as well as claim strategies prior to prosecution of the original patent (PX 368, Fleming deposition at 244). All these contacts contradict and destroy the validity of Fleming's statement regarding his contacts with Yeiser and his wholly unaided hand in fashioning the scope of the claims.

Also, in contradiction of both of his affidavits but especially the first, Fleming had substantial contacts with R.J. Tarantino, the President of LDC, during the relevant time period. Once again, LDC employed Yeiser and was the assignee of the application. Fleming's notebooks show fifty three (53) contacts between himself and Tarantino in the relevant time period. Thus, rather than having his communications with Tarantino and Yeiser "cut off" as he suggests in his first affidavit, Fleming had substantial and consistent contacts with both individuals. In short, Fleming's first affidavit is not only technically deficient, but substantively inaccurate.

Fleming's second and decisive affidavit is no more accurate than the first submission to the PTO. For example, Fleming stated that Yeiser had only a crude model upon which to analyze his patent and therefore made unintentional errors in preparing his original patent application. However, deposition testimony establishes that the Yeis-

---

**9.** Mr. Fleming's notebooks have been the subject of considerable interest in this litigation. Fleming kept time notebooks from 1970 to 1973 detailing daily activities in his patent practice. After Fleming ceased his record keeping, he took the notebooks home and placed them on a bookshelf. Years passed and other books accumulated on the bookshelves pressing the time notebooks to obscurity in the rear of the shelves. Some time later, according to B & L *sometime after the completion of the reissue application process*, Fleming discovered the no-

tebooks. The tomes contradict crucial parts of Fleming's affidavits.

As discussed below, it now appears that Fleming had discovered the notebooks and consulted them prior to the issuance of the reissue patent. This fact came to light during cross examination of Fleming at trial. Fleming could not explain the discrepancy between his recollection of the date of discovery of the notebooks and his own handwritten notes in September 1984 indicating reference to the notebooks.

er plotter which was the subject of the patent was delivered to potential customers for testing some three months before the patent application was filed (PX 374, McKaughan deposition at 12, 14, 22). An operative prototype of the plotter was exhibited at a trade show the month of the filing of the patent application (PX 383, West deposition 125–26). The patent file history itself contains reference to existing commercial models.

The fact that not only a model, but an actual working device was available, in addition to the contacts between Fleming, Yeiser, and Tarantino, belies the second affidavit's assertion that Fleming himself determined the scope of the claims. In his deposition, Fleming stated that most laymen are not interested and are not able to read patent claims. However, it is Fleming's practice to ask inventors what they consider significant about their invention—a lay person's approach to the issue of what should be included in the claims. Fleming stated:

> I did ask Yeiser, as I always asked inventors, which features and elements they consider the more significant and which the less significant and which one they feel should be covered in the claims, and to indicate some sort of a priority list or list of relative importance or significance, *which he did.* (emphasis added)

*See* PX 368, *Deposition of Lawrence Fleming* at 634.

This admission, in conjunction with other deposition testimony and other facts highlighted by HP, makes it clear that Fleming's second affidavit was flatly wrong in stating that Yeiser had no role in formulating the patent application. Yeiser was aware that "[o]ne of the main advantages of this type of X–Y is that the friction drive

permits the use of easily available unperforated graph paper in a moving chart X–Y." PX 19, Tab 14, *July 7, 1970 Memorandum from Jack Yeiser to Larry Fleming.* Furthermore, Yeiser aggressively played a role in developing the plotter for commercial use, *see* PX 383 *Deposition of John L. West,*[10] and had repeated contact with Fleming during the preparation and prosecution of the original patent application. Consequently, it is clear that Fleming's second affidavit, like his first, is riddled with errors and misstatements, providing no basis to support a showing of reissuable error.

#### (E) *B & L's Counter Argument:*

B & L raises ten different arguments in support of the position that there remain triable issues of material fact regarding the validity and accuracy of the Fleming affidavits. None of the arguments is convincing enough to warrant discussion. B & L is groping for straws suggesting that Fleming misunderstood the situation or that despite the numerous contacts and other evidence, Yeiser really had nothing or virtually nothing to do with the original patent application. No reasonable jury could find in B & L's favor on these arguments. *See Anderson v. Liberty Lobby,* 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Consequently, the Court rejects them all.

Finally, B & L argues that the Fleming affidavits were sufficient to show reissuable error even without the erroneous information. This is a throw-away argument, because it is clear that the patent examiner found at least the first affidavit itself inadequate for the task of showing error. The second affidavit merely bolstered the same arguments for reissuable error that were

---

**10.** HP does not specify the position of John West. Apparently, he worked for LDC at the same time as Jack Yeiser. One key portion of the West deposition testimony is as follows:

Q. Were any changes in the drive system made to these plotters after Jack Yeiser's death?
A. After Jack Yeiser left Florida and went back to California, I'm not aware of any specific change that took place in the recorder, in the XY recorder.

Q. So to the best of your knowledge, those XY plotters that LDC offered commercially for sale, it was Jack Yeiser that had the main input as to the design of that plotter?
A. Yes.
Q. And any other engineering changes that would have been made to those machines would have gotten a final approval from Jack Yeiser?
A. Yes.
Q. Because he was director of engineering?
A. Yes.

present in the first affidavit. All of these bases were erroneous as explained above. To wit, contrary to paragraph 4 of the second affidavit, Yeiser had more than a crude model, on one occasion, for two hours, to effect disclosure of the invention. Contrary to paragraph 5, Fleming did not alone determine the scope of claims of the patent based upon the "brief disclosure" of two hours referenced in paragraph 4. Moreover, Fleming has since admitted that he had discussions with Yeiser in flat contradiction to his statement in paragraph 5. Finally, the last paragraph of the second Fleming affidavit, paragraph 6, merely repeats the false information described earlier and adds the erroneous statement that Yeiser "no longer had a commercial interest in plotters and was not focussing on such matters." In fact, the West deposition testimony establishes that Yeiser was the chief engineer responsible for overseeing the commercial development of the plotter, that Yeiser had an active hand in developing the plotter for commercial purposes, and that no development of the product took place after Yeiser left Florida in 1974.

(G) *Summary of the Factual Issues Re HP's Summary Judgment Motion:*

■ HP has established clearly that the Fleming affidavits which were the basis for the grant of the reissue patent are replete with false or erroneous statements. B & L has raised no triable issue of fact which contradicts HP's showing. Further, B & L has not and can not point to any evidence supporting its position that the reissue application was properly granted because of reissuable error in the original patent application. Accordingly, the Court grants HP's motion for summary judgment and declares the Yeiser reissue patent invalid.

III. THE EFFECT OF GRANTING SUMMARY JUDGMENT DECLARING THE YEISER REISSUE PATENT INVALID.

■ Having concluded that the reissue patent must be declared invalid, there remains the question of the effect of such a ruling. The reissue patent contains 12 claims, but claims 1–9 are identical to the claims in the original patent. Only claims 10–12 were added through the reissue process. HP is charged with infringing five claims: claims 1, 2, and 10–12. HP contends that once the reissue patent is invalidated, all claims are extinguished. B & L argues in response that, at worst, only claims 10–12 should be extinguished with the nullification of the reissue patent and claims 1–9 should remain.

When a reissue patent is denied, under the regulations "the original patent will be returned to [the] applicant upon his request." 35 C.F.R. § 1.179. On the other hand, if the reissue patent is granted, the original patent is surrendered. The statute spells out the effect of reissue as follows:

> The surrender of the original patent shall take effect upon the issue of the reissue patent, and every reissued patent shall have the same effect and operation in law ... as if the same had been originally granted in such amended form ... to the extent that [the reissue patent's] claims are identical to the original patent, [it] shall constitute a continuation thereof and have effect continuously from the date of the original patent.

35 U.S.C. § 252.

Thus, in this case the original patent has ceased to exist. Although part of the original patent not affected in the reissue process, claims 1–9 only exist as part of the Yeiser reissue patent. If the reissue patent is entirely voided as HP contends, then those claims also will cease to exist. The effect would be particularly draconian for B & L, for its reissue application never questioned the correctness of claims 1–9.

In addressing the status of the "carry-over" original nine claims, the parties offer conflicting legal authority. Arguing that all twelve claims should be nullified, HP offers, *inter alia*, the cases of *Riley v. Broadway–Hale Stores, Inc.*, 114 F.Supp. 884 (S.D.Cal.1953), *aff'd*, 217 F.2d 530 (9th Cir.1954), and *General Radio Co. v. Allen B. Dumont Laboratories, Inc.*, 129 F.2d 608 (3d Cir.1942), *cert. denied*, 317 U.S. 654, 63 S.Ct. 50, 87 L.Ed. 526 (1942). B &

L counters seeking the preservation of the original nine claims citing the Supreme Court case of *Gage v. Herring*, 107 U.S. 640, 2 S.Ct. 819, 27 L.Ed. 601 (1883), and the opinion of Judge Learned Hand in *Foxboro Co. v. Taylor Instrument Companies*, 157 F.2d 226 (2d Cir.1946), *cert. denied*, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684.

The most interesting aspect of the legal analysis is the apparent conflict or inconsistency among three Supreme Court cases decided at the end of the Nineteenth Century. In *Gage v. Herring*, 107 U.S. 640, 2 S.Ct. 819, 27 L.Ed. 601 (1883), the Supreme Court clearly expressed the view that the invalidity of claims added by reissue does not "impair the validity of the original claim which is repeated and separately stated in the reissued patent." *Id.* at 646, 2 S.Ct. at 824. Subsequently, in the case of *Eby v. King*, 158 U.S. 366, 15 S.Ct. 972, 39 L.Ed. 1018 (1895), the Supreme Court revisited the issue and, although citing *Gage*, ignored the ruling of *Gage*, treating the question as one of first impression. As phrased in *Eby*, the issue is the effect of the surrender of the reissue patent and whether a patentee wagers all or nothing with his original claims when he seeks a reissue patent. The Court in *Eby* merely raises the question and then deliberately avoids resolving it by deciding the case on a different ground.

Two years later, in *Allen v. Culp*, 166 U.S. 501, 17 S.Ct. 644, 41 L.Ed. 1093 (1897), the Court confirmed that *Eby* had raised but not answered the question "[w]hether, if the reissue be void, the patentee may fall back on his original patent." *Id.* at 505, 17 S.Ct. at 645. Stating that the question "has never been decided by this court," *id.*, the Court in *Allen* then offered the suggestion that a patent surrendered after the grant of a reissue "might be inoperative and invalid as against certain persons who pirated the underlying principle of the patent, and avoided infringing the exact language of the claims, and yet be perfectly valid as against others, who were making machines clearly covered by their language." *Id.* As in *Eby*, the Court in *Allen* ignored the ruling in *Gage*. Indeed, *Gage* is not even cited in the *Allen* opinion.

The analytical question posed by these three cases relates to the proper approach to the carryover claims. *Eby* and *Allen* suggest that in light of invalidated reissue claims, the carryover claims should be examined as part of a surrendered patent. *Gage* suggests that carryover claims should be examined as part of the reissue patent, notwithstanding the invalidity of the reissue claims. The statutes and regulations support the *Gage* analysis.

To begin with, 35 U.S.C. § 252 evinces the intent that the "surrender" of the original patent acts to extinguish that patent and replace it with an amended edition. The reissued patent constitutes a "continuation" of the original and has "effect continuously from the date of the original patent." It would be a redundancy to permit the original patent to continue to exist because it has been completely replaced by the reissue. Furthermore, the timing prescribed in the statute is such that the surrender takes effect only "upon the issue of the reissued patent." In essence, the timing avoids creating an interference because it mandates surrender of the old only upon issuance of the new so that two patents covering the same invention do not exist simultaneously.

The foregoing assessment of § 252 is consistent with the pertinent PTO regulations on reissue procedures. Under the relevant regulations, the denial of a reissue application does not affect the original patent claims. Hence, under 37 C.F.R. § 1.178 if a reissue application is refused, "the original patent will be returned to [the] applicant upon his request." By analogy, when a district court strikes down a reissue patent after the reissue application has been granted, those claims that are carried over from the original patent which were not implicated in the reissue application should remain valid despite the surrender and extinction of the original patent.

While analytically it may appear odd to retain claims without a valid patent, the anomaly is merely one of semantics which Congress itself has adopted. In 35 U.S.C.

§ 253, Congress provides that "[w]henever, without any deceptive intention, a claim of a patent is invalid the remaining claims shall not thereby rendered invalid." A similar provision allows for the maintenance of infringement suits based on such remaining claims.[11] Thus Congress, like the Court in *Gage*, has chosen to assess carry-over claims in the context of problematic reissue patents in terms of the effect of the invalidated claims. There is no statutory support for *Eby* and *Allen*'s resurrection of the surrendered patent. .

A close examination of the case law confirms this assessment. Although the cases cited above and argued by HP do have some punch, the Court concludes that the proper result here is that the original patent claims should remain valid because the reissue application only added or amended claims 10–12. Beyond the Supreme Court's decision in *Gage v. Herring*, 107 U.S. 640, 646, 2 S.Ct. 819, 824, 27 L.Ed. 601 (1883) ("The invalidity of the new claim in the reissue does not indeed *impair* the validity of the original claim which is repeated and separately stated in the reissued patent."), the most potent precedent is *Foxboro Co. v. Taylor Instrument Cos.*, 157 F.2d 226 (2d Cir.1946), *cert. denied*, 329 U.S. 800, 67 S.Ct. 494, 91 L.Ed. 684. One particular passage from Judge Learned Hand's ruling in *Foxboro* is particularly relevant:

> All these [claims] were in the original patent in substantially the same form that they appear when reissued; and the same indeed applies to all the first sixteen claims of the reissued patent. As to these we need not consider whether Mason showed adequate excuse for any reissue whatever, because, even though he

did not, the surrender of the original patent, resulting from the acceptance of the reissue, did not invalidate any claims which he carried over into the reissue. For a time this was in some doubt [citing *Eby v. King*], but the amendment to [35 U.S.C. § 252] has set the question at rest.

157 F.2d at 228.[12]

Hence, the surrender of the original patent did not invalidate the claims which were carried over by B & L into the reissue patent application. The patent statutes, the regulations, and the more persuasive case law all point to the conclusion that the original patent claims which B & L carried over without substantial amendment or alteration in the reissue application should not be affected by the Court's rejection of the affidavits which were the necessary predicate for approval of the reissue application.[13] Good cause appearing therefor, the Yeiser reissue patent claims 10–12 are declared invalid. The carry-over claims 1–9 from the original patent remain valid.

## IV. TRIAL ON THE ISSUE OF INEQUITABLE CONDUCT.

### (A) *Introduction:*

Originally, the trial in this case was to begin with B & L's presentation of its case for infringement of the Yeiser reissue patent by HP. In view of the Court's ruling that claims 10–12 of the Yeiser reissue patent are invalid, B & L was prepared to proceed in enforcing the remaining nine claims of its reissue patent. However, under 35 U.S.C. § 288, B & L could only enforce those nine claims if the other

---

**11.** Title 35 U.S.C. § 288 states:

Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid. The patentee shall recover no costs unless a disclaimer of the invalid claim has been entered at the Patent and Trademark Office before commencement of the suit.

**12.** *See also* the United States Court of Customs and Patent Appeals' decision in *Application of Wittry*, 489 F.2d 1299 (CCPA 1974). Observing that the MPEP states that a finding of insuffi-

ciency of the oath offered in support of a reissue application should be a general ground of rejection of all claims, the court stated that the "instruction obviously is not applicable to original patent claims where, as here, the insufficiency does not apply to *all the new* claims in the reissue application." (emphasis in original) 489 F.2d at 1303 n. 3.

**13.** This conclusion also finds support in 4 Lipscomb's *Walker on Patents* (3d ed. 1985) § 14:38. The relevant section is entitled "Reissued Patents May be Valid as to Some Claims While Void As to Others."

claims were nullified not because of any "deceptive intention." The evidence presented in HP's motion for summary judgment raised a serious question whether the entire reissue patent was procured with a fraudulent intent or in such a manner as to have constituted inequitable conduct before the PTO. Consequently, the Court changed the order of the presentation of the case, directing HP to initiate the trial with the presentation of its affirmative defense of inequitable conduct.

(B) *The Applicable Legal Principles:*

 The doctrine of inequitable conduct "derived from the doctrine of unclean hands and is purely equitable in nature." *Gardco Mfg., Inc. v. Herst Lighting Co.,* 820 F.2d 1209, 1212 (Fed Cir.1987), *citing Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.,* 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945). Although it should not be a "magical incantation to be asserted against every patentee," *FMC Corporation v. Manitowoc Co., Inc.,* 835 F.2d 1411, 1415 (Fed.Cir.1987), the inequitable conduct defense does play a significant role in preserving the integrity of the patent application process. Due to the predominantly *ex parte* nature of PTO proceedings, patent examiners must be able to rely on patent attorneys' candor and good faith in prosecuting patents. The oath or affidavit requirement of the reissue application process serves to underscore this reliance.

Inequitable conduct is a broader concept than common law fraud, encompassing the "failure to disclose material information, or submission of false material information, with an intent to mislead." *J.P. Stevens & Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553, 1559 (Fed.Cir.1984), *cert. denied,* 474 U.S. 822, 106 S.Ct. 73, 88 L.Ed.2d 60 (1985). In order to prove inequitable conduct, a party must establish by clear and convincing evidence a threshold degree of materiality of the false or undisclosed evidence. *Id.* Although four distinct standards are available to test materiality, the Federal Circuit has expressed a clear preference for PTO Rule 1.56 as the best starting point for analysis. *See id.;* 37 C.F.R.

§ 1.56 (1987). The test is whether "there is a substantial likelihood that a reasonable examiner would have considered the omitted reference or false information important in deciding whether to allow the application to issue as a patent." *J.P. Stevens,* 747 F.2d at 1559; *see also Gardco Mfg., Inc., v. Herst Lighting Co.,* 820 F.2d 1209, 1214 (Fed.Cir.1987).

A finding that material information has been withheld or falsely presented to an examiner in itself does not establish inequitable conduct. "To be guilty of inequitable conduct, one must have intended to act inequitably." *FMC Corp.,* 835 F.2d at 1415. Proof of intent may be made by indirect evidence. *J.P. Stevens,* 747 F.2d at 1560; *Hycor Corp. v. The Schlueter Co.,* 740 F.2d 1529, 1539 (Fed.Cir.1984). In other words, inequitable intent may be inferred from actions the natural consequence of which would be to mislead or misinform the PTO.

In *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.,* 747 F.2d 1553 (Fed.Cir.1984), the court provided significant guidance on the principles relating to inequitable conduct. The case involved the yarn treating industry and, in particular, patents useful in producing desirable qualities in yarn. The court found that certain omissions by the applicants were highly material. Moreover, although there was no deliberate scheming, "there was clearly reckless or grossly negligent activity." *Id.* at 1567. Balancing materiality and intent, the court was "compelled to conclude that 'inequitable conduct' occurred." *Id.*

The important analytical point evinced in *J.P. Stevens* is that, when coupled with a high degree of materiality, gross negligence is sufficient to establish inequitable conduct. The court ruled that gross negligence is shown "when the actor, judged as a reasonable person in his position, should have known of the materiality of a withheld reference." *Id.* at 1560 (citations omitted). However, simple negligence, oversight, or an error in judgment made in good faith is not sufficient to show gross negligence. *Id.; Orthopedic Equipment*

*Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1383 (Fed.Cir.1983).

In a case decided after *J.P. Stevens,* the author of the decision, Chief Judge Markey, was at pains to point out that a finding of gross negligence alone does not mandate a finding of inequitable conduct. In *FMC Corp. v. Manitowoc Co., Inc.,* 835 F.2d 1411 (Fed.Cir.1987), writing for the panel, Chief Judge Markey noted that in *J.P. Stevens* no evidence was adduced to offset gross negligence by showing subjective good faith. 835 F.2d at 1415–16 n. 9. The court further observed that district courts must heed the reality that intent is a fact question and that in the face of an assertion of inequitable conduct, an objective gross negligence standard should not be applied harshly. Specifically, a patentee must be afforded an opportunity to testify as to his subjective good faith:

> [A]n applicant who knew or should have known of the art or information, and of its materiality, is not automatically precluded thereby from an effort to convince the fact finder that the failure to disclose was nonetheless not due to an intent to mislead the PTO; i.e., that, in light of all the circumstances of the case, an inference of intent to mislead is not warranted.

835 F.2d at 1416 (footnote omitted).

Taken together, the decisions in *J.P. Stevens, FMC Corp.,* and *KangaROOS U.S.A., Inc. v. Caldor, Inc.,* 778 F.2d 1571 (Fed.Cir.1985),[14] suggest that the proper approach to inequitable conduct entails a balancing of materiality and intent. No single factor or combination of factors is dispositive. Instead, even in the face of objectively damnable gross negligence or recklessness, the patentee must be provided an opportunity to raise a counter defense of subjective good faith. It is then up to the finder of fact to assess credibility in light of the evidence. The Federal Circuit does concede, however, that in a case where materiality is high and gross negligence is apparent, "mere denial of intent to mislead (which would defeat every effort to establish inequitable conduct) will not suffice." *FMC Corp.,* 835 F.2d at 1416.

**(C)** *The Potential Effect of Inequitable Conduct on the Carryover Nine Claims of the Yeiser Reissue Patent:*

B & L properly concedes that the allegation that it committed inequitable conduct before the PTO raises a direct challenge to the original nine claims of the Yeiser patent. "Once a court concludes that inequitable conduct occurred, all the claims—not just the particular claims to which the inequitable conduct is directly connected—are unenforceable." *J.P. Stevens,* 747 F.2d at 1561 (citations omitted). This is no less true in the instance of a reissue patent.

An example of the ramifications of inequitable conduct in the procurement of a reissue patent is provided in *Kearney & Trecker Corp. v. Giddings & Lewis, Inc.,* 452 F.2d 579 (7th Cir.1971), *cert. denied,* 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Then Seventh Circuit Judge John Paul Stevens authored the opinion for a divided court. The case involved plaintiff patentee's use of the services of a former patent examiner named Beall in procuring the reissue of a patent whose original application had been examined by Beall. Ignoring a rule against such a cross over from the role of an examiner to the role of an advocate, Beall's efforts were instrumental in garnering his client a reissue. Finding the plaintiff's tactics were a "gross abuse of the statutory privilege of reissue," Judge Stevens invalidated all claims that were added to the patent through reissue.

The second question faced by the court in *Kearney* was the proper disposition of the balance of the patent claims. As in this

---

**14.** In *KangaROOS,* the Federal Circuit reversed a ruling granting partial summary judgment on the issue of inequitable conduct. The court stated that despite a district court finding that it was "inconceivable" that KangaROOS could adduce evidence to change the district court's conclusion, "the weight of authority requires that

case, several claims [15] of the reissue patent were carried over without substantial change from the original patent. Citing 35 U.S.C. §§ 253 and 288, the court noted that suits to enforce patents containing invalid claims are authorized by Congress provided the invalidated claims were not due to "any deceptive intention." The court then concluded that "deceptive intention" means actual fraud or other forms of inequitable conduct, and, therefore, the conduct of plaintiff in using the services of Beall was sufficient to create a bar to the enforcement of the carryover claims on the basis of inequitable conduct.

Although the alleged form of inequitable conduct in *Kearney* differs from this case, the legal analysis is precisely on point. If the conduct of B & L in obtaining the Yeiser reissue patent was fraudulent or otherwise inequitable, then even the carryover claims from the original patent will be unenforceable because they will be tainted by the claims that were procured with "deceptive intention." With these legal standards in mind, the Court now makes the following findings of fact and conclusions of law.

### (D) *Findings of Fact:*

Before describing the details of the reissue application process, an introduction to the cast of characters is helpful. John O. ("Jack") Yeiser was the inventor of the '950 patent. Yeiser was a talented inventor for some two decades prior to the creation of his X–Y plotter. Yeiser had developed a highly successful strip chart recorder for Varian Associates in the 1950s.[16] In the 1960s, Yeiser founded his own company called Y–Labs in Costa Mesa, California. In approximately April 1970, Yeiser sold his business to Laboratory Data Control ("LDC") and went to work for LDC. Yeiser was an employee of LDC at the time the application for the '950 patent was filed in August 1970. He assigned the application to LDC.

Sometime between 1972–73, Milton Roy Company ("Milton Roy") acquired LDC and with it obtained the rights to the pending Yeiser '950 application. When the patent was finally issued on September 25, 1973, Milton Roy was the owner by assignment from Yeiser through LDC. After several years of less than satisfactory sales of strip chart recorders and X–Y plotters, Milton Roy discontinued production of those products to focus on its primary business as a manufacturer of high performance chromatography detectors.

After he sold his business to LDC, Yeiser apparently intended to remain in California, but LDC relocated to Florida. Drawn by what he considered to be a fine job opportunity as Director of Engineering at LDC, Yeiser attempted to relocate to Florida. *B & L Exhibits Vol. II* (Deposition of John West at 24).[17] When his wife objected, Yeiser undertook to maintain a Florida–California commute. According to a fellow employee of Yeiser at LDC, this commute proved too difficult for Yeiser, severely

---

KangaROOS not be denied that opportunity." 778 F.2d at 1577.

**15.** In *Kearney,* reissue claims 15, 19, and 20 were "substantially identical" with the their counterparts in the original patent. 452 F.2d at 581.

**16.** As explained in B & L's pretrial statement, electromechanical instruments that use a pen to trace a graph on paper generally fall into two categories: strip chart recorders or X–Y plotters. Strip chart recorders use long rolls of papers which are moved at a constant speed in one direction beneath a pen. The pen is constrained to move back-and-forth at right angles to the direction of the paper movement. As the paper moves past the pen, the pen writes across the paper creating a graph or other recording.

X–Y plotters are capable of plotting data generated externally to the plotter along two axes at right angles, commonly called the X-axis and the Y-axis. In an X–Y plotter, the variable data for both axes is applied as external varying input signals to the plotter. One external input signal controls how the pen writes vis-a-vis the X-axis, and the other external input signal controls how the pen writes with respect to the Y-axis. *See B & L Pretrial Statement* at 4.

**17.** Although a large corpus of evidence has been introduced by the parties, much of it relates to other issues to be tried. That portion of the evidence relating solely to the issue of inequitable conduct in procuring the reissue patent has been assembled in binders and hereafter will be referred to as "HP Exhibits" or "B & L Exhibits."

straining his personal life, and he eventually had to leave LDC and return to the West Coast. *See HP Exhibit 316* (deposition of John West). For reasons that only Yeiser himself will ever know, Jack Yeiser committed suicide in 1974.

Lawrence Fleming is a private patent agent residing in Pasadena, California. Fleming graduated from the California Institute of Technology in 1937 earning a B.S. in mechanical engineering. *B & L Exhibits Vol. I* (Fleming deposition at 7). Fleming is not an attorney, although he has been licensed to practice before the PTO since 1954 and has himself earned over twenty patents as an inventor. *B & L Exhibits Vol. I* (Fleming deposition at 17, 8).

Fleming was a friend of Jack Yeiser from 1959 to Yeiser's death in 1974 and he did all of Yeiser's patent work. Fleming worked as outside counsel for LDC and then Milton Roy in the procurement of the '950 patent. Fleming was approximately seventy years old at the time of the reissue application and was recounting events that transpired over a decade before.

Bernard D. Bogdon was B & L's in-house counsel responsible for overseeing the reissue application of the '950 patent. Throughout 1981 and 1982, Bogdon had primary responsibility for the legal needs of B & L's Houston Instrument Division.

Howard Robbins was a subordinate to Bogdon who joined the company in late 1982. Robbins assumed responsibility for the legal needs of the Houston Instrument Division early in 1983 and through the relevant time period of the reissue process.

William Hyer was outside patent counsel for B & L on the '950 reissue application. Hyer ran his own firm in Houston, Texas and had decades of experience as a patent attorney. In April or May 1982, Hyer began to delegate work to an associate in his firm, Jonathan Jobe. Jobe was asked by Hyer to do research on the steps necessary to obtain the reissue of a patent and was given the task of preparing the first draft of reissue claims and a reissue oath for the '950 patent.

When Hyer died in November 1983, for a short time Jobe took primary responsibility for the '950 reissue work. *B & L Exhibits Vol I* (Bogdon deposition at 301). However, Hyer's death signalled the end of Jobe's involvement. *TR. Vol. 4–624* (testimony of Jonathan Jobe). Around that time period, the examiner rejected the first amended application. Subsequently, primary responsibility for the reissue application reverted to B & L in-house counsel, Howard Robbins. *B & L Exhibits Vol. II* (Jobe deposition at 237). In other words, Jobe was responsible for writing the original application and the first amendment and Robbins wrote the second amendment which was finally accepted by Examiner Hartary.

Thomas Hall was a top executive with the Houston Instrument Division of B & L, serving as sales manager and, from November 1982 throughout the period in question, was in charge of all planning. *B & L Exhibits Vol. III* (PX 181). Hall was the liaison between B & L counsel and Houston Instrument President George More. Mr. More was also corporate vice president of B & L at the time of his involvement in procuring the Yeiser patent. Hall, More, and Bogdon were the three individuals who decided to purchase the '950 patent from Milton Roy in 1982. *B & L Exhibit Vol. I* (Bogdon deposition at 134, 263).

Sometime in late 1980 or early 1981, HP introduced its X–Y plotter with a pinch roller type drive assembly. This "grit wheel" plotter apparently was the first of its kind and enjoyed significant commercial success. B & L's Houston Instrument division (hereafter sometimes referred to as B & L) stated that "HP jumped into [the] market in 1980 with [a] superb unit. Now HP is [the market] leader...." *HP Exhibit 3.* B & L immediately took steps to investigate the HP product and to begin the process of producing a competing product.

The President of the Houston Instrument division of B & L, George More, was a driving force behind B & L's attempts to compete with HP's X–Y plotter. He directed five of his employees, led by a Mr.

Napoli, to develop a machine that had the same basic specifications as the HP machine, but at a reduced cost. The reason for such an undertaking is clear: the HP plotter was a commercial success that had no piers. One B & L employee testified in a deposition that the HP plotter "was a fine design. It was one of the nicer recorder designs of the last 15 years." *HP Exhibit 13.*

After experiencing frustration and disappointment in failing to develop a viable grit wheel drive, B & L hired outside counsel to do a search of patent literature. B & L "wanted to know everything there was to know about what HP might have in the way of plotters, paper drives, and pen mechanisms. Every potential element of a plotter...." *HP Exhibit 18* (Hall deposition); *see also HP Exhibit 20* (letter dated February 26, 1981, from B & L in-house counsel Bernard Bogdon to patent researcher Elliott R. Greenwald requesting "state of the art search" focusing particulary on HP).

In approximately April of 1981, B & L first learned of the existence of the Yeiser patent through this patent search. The Yeiser patent appeared as a citation against a patent that was owned by HP. In a letter dated May 21, 1981, from in-house patent counsel Bernard Bogdon to B & L engineer James A. Parnell, Bogdon listed the Yeiser '950 patent among twelve citations of art found that related to HP's new grit wheel design. Bogdon stated, however, that "[n]one of these patents appear[s] to be particularly pertinent to Hewlett Packard's design." Bogdon also included a copy of each patent along with his letter. *HP Exhibit 25.* Several top B & L officials read the Yeiser patent around that time (May 1981), including Parnell and Thomas Hall.

A few months later, B & L decided to purchase the Yeiser patent from its registered assignee, Milton Roy Company. Hall, Parnell, and More made the decision. *See HP Exhibit 27.* The decision apparently was later discussed with outside patent counsel, William Hyer. At some point during the time that B & L contemplated purchasing the Yeiser '950 patent, Jim Parnell and Thomas Hall had a private discussion about the relevance of the Yeiser patent to the HP mechanism. Parnell apparently was of the view, a view that Hall later shared, that the Yeiser patent was a "master patent" that would supersede any patent HP might have or eventually obtain. B & L asked William Hyer as outside counsel if he concurred in B & L's view of the scope of the Yeiser patent. It can be inferred that Hyer gave a positive opinion of the scope of the Yeiser patent as against HP's grit wheel plotter because in September 1981, George More contacted the President of Milton Roy about purchasing the '950 patent. On May 5, 1982, B & L bought the Yeiser '950 patent from Milton Roy for $30,000. *HP Exhibit 63.*

Thomas Hall testified in a deposition that either before the purchase or immediately afterwards, B & L was aware of the need to file a reissue application. *See also HP Exhibit 64* (Bogdon deposition stating that reissue course was "decided" "shortly after the acquisition"). Hall further testified that William Hyer, in advising B & L that a reissue was needed, had stated that the "claims in the original Yeiser were too damn broad" and that narrower claims were needed. *HP Exhibit 61.*

Thomas Hall also testified that the business objective of procuring the Yeiser patent was to "go to others and negotiate with [it]." *HP Exhibit 62.* Hall stated that the primary reason for acquiring the patent was to protect B & L from HP. *B & L Exhibits Vol. I* (Hall deposition at 205). Ideally, B & L desired to avoid litigation and compete against HP's superior product by negotiating a cross-licensing agreement. *B & L Exhibits Vol. I* (Hall deposition at 216). Bernard Bogdon described B & L's actions as gaining "leverage." *HP Exhibit 201; see also TR. Vol. 6–869* (testimony of Bernard Bogdon). Bogdon admitted during deposition testimony that the same day that B & L acquired the '950 patent, Mr. Jobe's time records indicated that he spent the afternoon doing a "reissue investigation," *HP Exhibit 380*, although Bogdon denied that B & L purchased the patent to

use against HP. *B & L Exhibits Vol. I* (Bogdon deposition at 270).

In other words, the patent was obtained for strategic reasons relating to negotiation and possibly litigation, against HP and others. The same is true of the reissue application, for as counsel for B & L has made clear, "the reissue was done with a view to litigation against Hewlett Packard throughout." *HP Exhibit 68* (Statement of Laurence Pretty). In fact, Jonathan Jobe who drafted the reissue application stated in deposition testimony that not only was litigation one of the purposes for seeking a reissue patent, it was the only reason of which he was aware. *HP Exhibit 69.* B & L acquired the patent, intended to threaten litigation, and then extort a cross-license agreement from HP. After its engineers were unable to compete in technical innovation and creation, this was the most expedient way for B & L to compete against the HP X–Y plotter.

As noted above, Jonathan Jobe was the attorney who drafted the reissue application and the first amendment. It was Jobe's first reissue application, although he was working on another application at the same time as the '950 reissue. *B & L Exhibits Vol. II* (Jobe deposition at 84). Jobe consulted with his superior, William Hyer, in formulating the draft. *TR. Vol. 4–607.* Hyer gave to Jobe the specifics of the HP X–Y plotter so that Jobe could take those specifications into consideration in formulating the reissue claims, *HP Exhibit 75; TR. Vol. 4–630* (testimony of Jonathan Jobe), and, in fact, Jobe drafted the three new claims including the exact specifications included in the HP X–Y plotter. *HP Exhibit 76.*

Jobe also drafted the More declaration. In that declaration, More stated that Yeiser and Fleming committed an error in the original application. Jobe admitted that he did not know "how [More] could have known one way or the other." *B & L Exhibits Vol. II* (Jobe deposition at 192). The following deposition exchange captures Jobe's understanding of the meaning of "reissuable error":

Jobe: I think that people normally believe that errors are unintentional and if an error was made or if a mistake was made—

HP Counsel: But how did [More]—that's a good point. How did he know it was a mistake that claims were left out?

Jobe: Because they weren't in.

HP Counsel: Couldn't it have been intentional?

Jobe: Who knows?

. . . . .

Jobe: I think that your last question or comment or a previous one assumes that claims like [reissue claims 10–12] were considered and rejected.

HP Counsel: Well, do you know that they weren't?

Jobe: No, I don't know.

HP Counsel: Does anyone?

Jobe: Fleming probably knows.

HP Counsel: But no one contacted Fleming at this point in time; isn't that correct?

Jobe: That's correct.

*B & L Exhibits Vol. II* (Jobe deposition at 192–93).

A draft of the reissue application was delivered by Jobe to Bogdon on October 2, 1982.

George More, whose declaration formed a crucial part of the reissue application, had virtually no involvement in the preparation of the application. He had at most two discussions with William Hyer prior to the filing of the reissue application, both of which were, in the words of More, "very cursory." *HP Exhibit 147.* More stated that he had no independent opinion regarding the addition of claims through a reissue application other than that the patent needed improvement and that he was willing to do anything to make the patent better. *B & L Exhibits Vol. II* (Deposition of George More at 165). More stated that "[i]f somebody had pissed on it [the original Yeiser patent], it would have made it better. But the point is, anything better." *HP Exhibit 154.*

More simply left is to Bogdon's department, Hall, and Hyer as "[c]ompetent pro-

fessionals practicing on a day-to-day basis" to do whatever was necessary to obtain a patent that could be used against HP. *See HP Exhibit 155.* Thus, he did not review the reissue application before it was filed. *B & L Exhibits Vol. II* (Deposition of George More at 177–78) Although he did read the affidavit bearing his name, *B & L Exhibits Vol. II* (More deposition at 214), More signed the affidavit "on the basis of the information supplied to [him] by trusted counsel of [B & L]. [More] had no information to dispute any of the things in [the] statement." *HP Exhibit 161.* In particular, the "oversight" mentioned in the More affidavit was never described to More, nor did he inquire as to its purported nature. *B & L Exhibits Vol. II* (Deposition of George More at 243). Indeed, More was told by Thomas Hall that he was better off not asking any questions and that he did not need to know any details. *HP Exhibit 163; B & L Exhibits Vol. II* (Deposition of George More at 163).

On the issue of "oversight" as referenced in the More declaration, Bernard Bogdon stated that the basis for the assertion was the investigation that was conducted prior to the filing of the reissue application. The investigation involved "the file history, the patent itself, and the efforts and counselling with [B & L's] ... outside law firm." *HP Exhibit 64.* B & L made absolutely no independent investigation of the history of the '950 patent application. None of the principles involved in procuring the '950 patent were contacted prior to the filing of the reissue application. The only discussions that took place were among Bogdon, Jobe, and Robbins, with More receiving cursory information on two occasions from Bogdon. More and Jobe never met or discussed the reissue application, despite the fact that it was Jobe who wrote the affidavit that More signed.

No investigation was made into the '950 patent itself to ascertain its validity. *HP Exhibit 202* (Robbins deposition). Furthermore, despite the fact that B & L professed to believe that the patent attorney who

prosecuted the '950 patent made an error, B & L did not think it was necessary to contact Lawrence Fleming to discuss the supposed error with him. *B & L Exhibits Vol. I* (Bogdon deposition at 388). No one at B & L made any attempt to assemble the prior patents of Jack Yeiser. *HP Exhibit 167.* No attempt was made to ascertain whether the invention had been made or used before in the United States, despite the fact that More's affidavit states that "I do not know and do not believe that said invention was ever made or used in the United States of America before the invention thereof by said John O. Yeiser." *Id.*

B & L took the position that no investigation was necessary. There was no deceptive intent because "[t]he file history never told us otherwise." *B & L Exhibits Vol. I* (Bogdon deposition at 393). Jonathan Jobe stated that he included the reference to "oversight" because "it is required by the statute and I believed that the error arose without deceptive intent because there was nothing to be gained by leaving out such claims. I can't imagine any deceptive reason for not including those claims." *TR. Vol. 4–612.*

The first contact with Lawrence Fleming occurred on June 17, 1983—after the examiner had rejected the application and told B & L to obtain the statement of the original patent agent. On that date, Jonathan Jobe called Fleming and spoke to him for less than thirty minutes. *HP Exhibit 234.*[18] Jobe was the only individual associated with B & L who spoke to Fleming prior to the filing of his first affidavit. In handwritten notes bearing the date June 17, 1983, Jobe wrote that "the inventor did not feel there was a great deal of novelty...." and added that Fleming "didn't get much info out of Yeiser—Yeiser very brilliant but not much help." *HP Exhibit 235.*

Fleming's handwritten notes from the June 17, 1983, telephone call reflect that Jobe informed him of the addition of dependent claims stemming from claim one of

---

**18.** At trial, Jobe stated that he spoke to Fleming the first time for "approximately half an hour."

*TR. Vol. 4–615.*

the original Yeiser patent. Fleming wrote that the new claims were "[m]ore explicit—new cls. 10–12." Fleming also appears to have been informed that the PTO examiner rejected the claims because of a failure to show error. Fleming's notes state: "Exr.—no error." Jobe also reported to Fleming the general content of the More affidavit and the purported source of the "error" as represented by More in the affidavit. *HP Exhibits 237–38; see also TR. Vol. 4–616–18* (testimony of Jonathan Jobe).

Other than providing a rudimentary explanation of the purpose of his call and the general nature of the application, Jobe provided nothing else to Fleming. Jobe did not send Fleming a copy of the reissue application, a copy of the new claims, a copy of the PTO response to the application, or a copy of the More declaration. *See HP Exhibits 238–39.*

The Court notes the that Jobe's statements to Fleming in essence told Fleming that he had made a tremendous blunder many years before. According to Jobe, he told Fleming who he represented, "I told him that we were attempting to reissue the Yeiser patent, I told him what the defects were and asked him if he could shed any light on how those defects occurred." *TR. Vol. 4–616.* B & L's expert, Rafael V. Lupo, testified during trial that it was patently obvious that the original '950 application should have included narrower, or "intermediate" claims encompassing specific features of the pinch roller assembly. According to Lupo, Fleming made an egregiously obvious mistake in failing to stake a claim including those specific features. Although concededly stated with less emphasis, Jobe's report to Fleming constituted an equivalent indictment of Fleming's ability and professional competence. Jobe's lead off question, then, was to ask how Fleming could have made such a mistake, thereby inducing Fleming to explain away his omissions.

Given this reality, it is not surprising that Fleming generated several excuses to absolve himself of his omission. As plaintiff's expert, James Gambrell, stated at trial, B & L "first contacted Mr. Fleming and ... asked him to explain how the error occurred. But they never asked him what the error was." *TR. Vol. 2–215.* B & L and Jobe hoped that Fleming would attempt to justify his action, as he did. Regardless of the veracity of his statements, they provided some substance to the More affidavit's assertion of "oversight" as the basis for reissuable error. In essence, Jobe's phone call was an invitation to Fleming to stir his memory in search of whatever *post hoc* rationalizations were available to put in an affidavit supporting the More affidavit's assertion of "oversight." Once stirred, Fleming's memory prompted several (as it turns out) grossly inaccurate statements. Yet this served B & L's purpose, forming the basis for the first Fleming affidavit.

During trial and in motions preceding trial, B & L emphasized repeatedly that at the time of the telephone contact with Jobe, Mr. Fleming was over seventy years old and was trying to recall events that transpired over a decade before. B & L argued vociferously, as the truth came out, that Fleming's recollections were simply the product of a bad memory and not evidence of bad faith or inequitable conduct on the part of B & L.

A bad memory, plus elements of pride and rationalization as described above, do explain how Fleming was able to make such wildly incorrect statements in his affidavits. This does not alter the fact, however, that B & L never did anything at all to confirm the accuracy of Fleming's recollection of the original patent application. At trial, Jobe indicated that he thought that Fleming had located his file on the patent prosecution "while we were on the telephone." *TR. Vol. 4–617.* Yet, Jobe "does not recall" whether he asked Fleming to send him his prosecution file. *HP Exhibit 240.* Jobe also recalls that he did not ask Fleming to look for other documents. *Id.* Jobe "does not recall" whether or not he asked Fleming if he kept time diaries. *Id.* Jobe "does not recall" whether he ever asked Fleming to see all of the documentation he had regarding the preparation, filing, and prosecution of the original '950 patent application. *HP Exhibit 241.* Jobe

does recall that he never contacted anyone at Milton Roy or LDC or Y–Labs to substantiate the assertion of "limited contacts" between Yeiser and Fleming during the application. *HP Exhibit 244.*

Jobe received from Fleming one documentary piece of information regarding the original prosecution, a memorandum of July 7, 1970 from Yeiser to Fleming (hereafter the "7/7/70 Memo"). Yet Jobe does not recall whether he asked Fleming for it or Fleming volunteered to send it to him, *id.*, and Jobe admitted that he never asked Fleming whether the file contained any other memoranda from the inventor. In addition, Jobe never asked Fleming about the contents of the 7/7/70 memorandum or inquired as to what Fleming thought Yeiser meant in the memorandum.

As to the specifics of the affidavit itself, neither Jobe nor anyone else at B & L inquired of Fleming as to the details of his statements. For example, Jobe never asked Fleming any details about his contacts with Yeiser during the original application process. *HP Exhibit 243.* Jobe did not ask Fleming to check his time sheets to confirm his recollections. *HP Exhibit 244.* Jobe did not discuss with Fleming the original file history, the prior art, or any office actions. *Id.* Jobe did not ask, or does not recall asking, Fleming if Yeiser played any role in assisting him in drafting the claims, *HP Exhibit 248*, or whether Fleming and Yeiser discussed the scope and breadth of the claims that were to be made. *HP Exhibit 249.* Jobe did not ask about the nature or content of the contacts between Fleming and R.J. Tarantino (L.D.C.'s president) or between Fleming and Virgil Woodcock of Philadelphia despite the fact that both individuals are specifically mentioned in the first Fleming affidavit. *See HP Exhibits 242, 250, 251, and 252.* Jobe never asked Fleming whether the claims that were to be added in the reissue application had ever been drafted by him or discussed

in any context in connection with the original application. *HP Exhibit 255.*

In addition to the less than thirty minute telephone conversation, Jobe also relied upon a one page letter written by Fleming on June 20, 1983, as a basis for the first Fleming affidavit. In the letter, Fleming stated that he had "pulled out the old file" and reviewed it. Fleming reiterated six reasons apparently explaining why the patent had not been drafted to include intermediate claims. All of the reasons are mentioned in the first Fleming affidavit and include: (1) Yeiser had sold his business (and, one is to infer, therefore had little interest in a patent assigned to his new employer; (2) LDC moved from California to Florida, thereby placing some 3,000 miles between Fleming and Yeiser; (3) Mrs. Yeiser refused to move to Florida (and, one must infer, put a great strain on Jack who tried to commute between Florida and California); (4) Fleming's only other contact at LDC was President Tarantino, who was too busy to help; (5) LDC's patent attorney, Virgil Woodcock, left the application in Fleming's hands except to receive copies of the papers and letters (and thus Fleming received no in-house guidance); and (6) before the patent was issued, LDC was acquired by Milton Roy (and, one might infer, placed another layer of space between Fleming and any source of information). Fleming closed the June 20, 1983, letter by stating that he "suppose[d]" that "business and personal activities of inventor and assignee worked, inadvertently, to cut off communication with the patent practicioner [sic]." *HP Exhibit 266.*

Despite the fact that the June 20th letter played a prominent role in the preparation of the first Fleming affidavit, Jobe never queried Fleming about its contents. Instead, Jobe merely sent to Fleming a prepared affidavit for his review and signature on September 13, 1983. He followed up his mailing with a brief telephone call confirming that Fleming had received and signed the affidavit.[19] Nothing more was

---

19. There was one other telephone call placed by Fleming to Jobe, but it concerned solely the issue of Fleming's bill. *See HP Exhibit 269–70.* Jobe stated that he and Fleming spoke for a

minute or two about whether Fleming could send Jobe a bill for his efforts. That conversation may have taken place on June 20, 1983. Subsequently, Fleming sent B & L (through

discussed or reviewed. In other words, Jobe did not conduct a follow-up interview with Fleming. *See HP Exhibit 302.* Even something as obvious as Fleming's reference to his "old file" did not precipitate a follow-up inquiry from Jobe. In short, Jobe accepted as true, without any corroboration, every fact related by Fleming. On September 14, 1983, Fleming sent back the signed affidavit. *HP Exhibit 304.*

On September 19, 1983, B & L filed its first amendment to the reissue application. The application was rejected on October 31, 1983. Due to a mix-up in mailing, the second PTO rejection was mailed again on December 2, 1983. In the meantime, Howard Robbins had met with Patent Examiner Hartary to discuss the shortcomings in B & L's amended application. *See HP Exhibit 340.* Howard Robbins was responsible for pursuing the reissue application for B & L after Hyer's death and Jobe's exodus.

Robbins made the next contact with Lawrence Fleming on February 10, 1984. Robbins telephone notes indicate that he basically covered the same ground canvassed by Jobe. *See HP Exhibit 345.* The second Fleming affidavit reflects the new information and emphasis gleaned by Robbins from the February 10, 1984 conversation. Specifically, Yeiser allegedly had but a single, crude model available to him for two hours to effect disclosure of his invention. As a result, Fleming allegedly had to write the claims himself relying on his own experience and knowledge. Also, Fleming felt that Yeiser did not appreciate the significance of his invention.

Robbins spoke with Fleming a second and final time on February 20, 1984.

Although Robbins himself did read the file history, *HP Exhibit 348,* he stated that he did not know whether Jobe or Bogdon had ever reviewed the original file history. *HP Exhibit 214.* Robbins also stated that he did notice that the file history of the '950 application made reference to a commercial model embodying the principles of the Yeiser '950 patent. This reference appeared in two one-line amendments to

the '950 application. *See HP Exhibit 348.* Robbins also was aware of the reference in the first Fleming affidavit to the availability of only a crude model for Yeiser to effect disclosure of his creation, and Robbins himself added the language in the second Fleming affidavit with respect to the limited availability of only a crude model. Nevertheless, Robbins never asked Fleming about his mention of the commercial embodiment in the file history of the '950 application. *Id.* In other words, even though he was aware that Fleming had stated in the early 1970s that there was a commercial model of a Yeiser-like machine in production, Fleming accepted without question Robbins' statements in the reissue affidavits that Yeiser had only a crude model to help him claim the invention.

Like Jobe before him, Robbins failed to ask even the most basic of questions concerning the veracity of Fleming's statements, nor did he provide Fleming with any information concerning what was happening in the PTO with the reissue application. Robbins did not ask Fleming if he kept time records or work diaries. *HP Exhibit 349.* Robbins did not ask Fleming how many contacts he had with Yeiser during the application process, *HP Exhibit 350,* and thus obviously made no inquiry as to the quality of the contact between Yeiser and Fleming. Robbins did not send Fleming copies of any of the PTO actions, nor anything else save the second affidavit which was sent to Fleming on February 20, 1984. *HP Exhibits 351–2.* The signed affidavit was returned by Fleming to Robbins the next day. *HP Exhibit 353.*

On March 27, 1984, the second amendment to the reissue application was filed by B & L with the PTO. On April 12, 1984, examiner Hartary withdrew his objections to the oath submissions and granted approval for reissue of the '950 patent. *HP Exhibit 363.* Less than two weeks later, on April 24, 1984, Thomas Hall wrote to HP accusing it of infringing B & L's new reissue patent (notwithstanding the fact

Jobe) a bill for 1.25 hours of work for a total of $75. *Id.*

that the reissue did not take place until September 25, 1984) and extended a gracious olive branch of settlement of the implicitly threatened lawsuit "[i]n the interest of achieving an early amicable resolution to this matter." *HP Exhibit 364*. HP's response was to file this suit for declaratory relief.

On September 13, 1984, Lawrence Fleming met with an investigator hired by B & L named Bill Ellis. Fleming sent B & L a bill for 7.1 hours of his time in connection with the interview with Ellis, although the interview lasted only two hours by Fleming's recollection. *B & L Exhibits Vol. I* (Fleming deposition at 44). Fleming does not recall how the interview was set up; it may have been a telephone call from Robbins or from Ellis' office. Fleming does recall that prior to the interview, Robbins called him.

Several topics never before discussed came to the fore in the telephone call with Robbins and the interview with Ellis. It is not clear how the subject of Yeiser's assistant arose,[20] but it had not been discussed with Fleming during the reissue application process. Apparently in preparation for his meeting with Ellis and during the meeting, *TR. Vol. 4–592*, Fleming wrote some notes to himself which included reference to a man named Ronald E. Ross. *See HP Exhibit 368*. This appears to be the first mention of Mr. Ross by Fleming. Ross "was # 1 asst. to Jack Yeiser [and] source of info." according to Fleming. B & L also asked Fleming, again apparently for the first time, about Yeiser's contacts with LDC President Tarantino. *B & L Exhibits Vol. I* (Fleming deposition at 37, 39). Regarding Tarantino, Robbins by telephone asked Fleming how many contacts he had with Tarantino and the topics of their discussions. *Id.* These questions had been completely ignored prior to the grant of the reissue application. Ellis asked Fleming

about the "circumstances of the disclosure of the invention; contacts with the inventor and with Mr. Tarantino; the nature of the acquaintance between [Fleming] and Mr. Yeiser; Mr. Yeiser's marital problems, if any...." *B & L Exhibits Vol. I* (Fleming deposition at 44).[21]

The most important piece of information in Fleming's notes, however, is found on the second page where Fleming wrote: "Yeiser was in Florida 3/72–11/72 by best info. *in my old notebooks.*" *HP Exhibit 368* (emphasis added). As discussed earlier, the notebooks referred to by Fleming are time diaries he kept from 1970–73. Throughout the course of this case, B & L has maintained that Fleming had forgotten about his old notebooks after he moved into a new residence in Pasadena. Supposedly, the notebooks inadvertently were shoved to the back of an old bookcase and forgotten until discovery mid-way through this litigation. By the above reference in his notes, Fleming admitted that he *had* the notebooks and *referred to them* in September 1984 *before* the '950 patent was reissued.

On cross examination at trial, Mr. Fleming insisted that he had spoken to B & L in the course of the reissue process relying only his memory and his few notes from the original application period. Fleming insisted that he had not used the notebooks. When confronted by his own handwritten notations from September 1984, Fleming was forced to admit that he must have known about and used the notebook at least by September 1984. *TR. Vol. 4–592–96*. Upon further cross examination, HP established that Fleming had used the notebooks to gather certain information about Yeiser whereabouts during the period in question, for example, the timing of his transfer and domicile in Florida. Despite the precision of the details provided by Fleming, neither Jobe, Robbins, nor Bogdon ever asked Fleming if he kept note-

---

**20.** In cross examination at trial, Fleming did not recall whether he or investigator Ellis had brought up the subject of Jack Yeiser's assistant. *TR. Vol. 4–591*.

**21.** The reason these questions were asked relates to dispute between B & L and HP over

ownership of the patent. Mrs. Yeiser apparently had executed a quitclaim deed to HP who was then claiming ownership. That dispute is irrelevant here, but it is highly relevant that when it sought the truth B & L knew how to ask direct questions.

books, if he referred to notebooks, or if he referred to any other written material in responding to B & L's inquiries. *TR. Vol. 4–596.*

B & L's position at trial was that although the oath requirement included an averment of error, this does not mean literal error. Howard Robbins stated that the "absence of the language [of the added claims] in the '950 patent is what was expressly stated to be the errors." *B & L Exhibits Vol. II* (Deposition of Howard Robbins at 361). To Robbins, it was "plainly evident from a review of the '950 file history" that omission of the narrower claims was error. *Id.* It was an error, from Robbins and B & L's perspective, because they believed that the claims should have been included. During trial, Bogdon stated that after examination of the '950 patent, "we drew the conclusion that the claims that went to the driving roller means were inadvertently omitted." *TR. Vol. 6–876.* Yet Robbins, like Jobe, had no idea whether the omission of the intermediate claims was intentional. When asked to identify support in the file history for his belief, Robbins could only say that he looked at claim 1 of the patent, saw no intermediate claims deriving from claim 1, and concluded that Fleming and Yeiser must not have considered including such claims. *B & L Exhibits Vol. II* (Deposition of Howard Robbins at 368–69). Put another way, Robbins had "no reason to believe that the absence of that language [claims 10–12] was anything other than oversight, inadvertence." *B & L Exhibits Vol. II* (Deposition of Howard Robbins at 368). Yet Robbins never asked Fleming directly whether he and Yeiser discussed narrower claims. *B & L Exhibits Vol. II* (Robbins deposition at 388). In effect, Robbins never asked the glaringly obvious question of why he omitted the material added by B & L in its reissue claims, *i.e.,* how was it that Fleming committed this error that was so plainly obvious to Robbins.

Two experts testified at the trial. HP offered the testimony of James B. Gamb-

rell. B & L countered with the testimony of Rafael V. Lupo. Both men are more than qualified to offer expert opinions in the areas of patent office practice, procedure, and standards of practice.[22] As one would expect, the experts offered differing views on the proper characterization of B & L's conduct.

James Gambrell was not only qualified but fully prepared to offer his opinion of B & L's conduct with respect to the reissue application. Gambrell had read all relevant testimony and records and was conversant regarding all matters pertinent to the issue of inequitable conduct in the procurement of the reissue application. Gambrell stated his opinion at the outset that he believed that the reissue patent "was inequitably obtained and should be held˜unenforceable." *TR Vol. 2–137.* The balance of his testimony on direct examination set forth the bases for his opinion.

Preliminary to the discussion of the basis of his opinion, Gambrell explained the concept of "error" within the meaning of 35 U.S.C. § 251, the primary reissue statute. If an inventor claims what he wants and receives what he claims, then there is no error. According to Gambrell, "[i]t's not a way in which you can go back and get a second bite at the apple just to see whether or not you might get [the patent] on a different basis or on a hindsight you think that you could have gotten a better patent or one that's more to your liking due to what's happening in the industry." *TR. Vol. 2–140.*

Gambrell then described in detail the type of thorough investigation he would undertake as a reliable, competent patent practitioner seeking to reissue a defective patent. According to Gambrell, "[t]he patent office rules are very clear. When you sign a document submitting it to the patent office, your signature represents that there is good cause for that, and I think implicit in that is that you made a reasonable investigation." *TR. Vol. 2–164.* Gambrell con-

---

**22.** Mr. Gambrell's resume is found at *PX 148.* Mr. Lupo's resume is found in B & L general

trial exhibits at DX84.

cluded that B & L "had to make an investigation" to determine whether the declaration and affidavits were correct. *TR. Vol. 2–170.* In Gambrell's judgment, "in reading the record, that investigation was not made." *Id.*

In addition, Mr. Gambrell offered his opinion that B & L acted inequitably by failing to return to the PTO once it learned of the errors in Mr. Fleming's affidavits. *See TR. Vol. 2–295.* Gambrell testified that it was his "view that it would be proper practice, based on my experience in my profession, for a lawyer to [report Fleming's errors], under these circumstances." *TR. Vol. 2–299.* On cross examination, Gambrell admitted that he knew of no specific rule or regulation requiring a patent attorney to write to the PTO or seek a reissue if he learns that a prior reissue was granted on the basis of fraudulent representations. Gambrell's view was that in reissue or in an original application, the duty of candor is the same; it requires complete and honest disclosure of material information relating to the application in question.

On cross examination, Gambrell admitted that a reasonable patent attorney looking at the '950 patent could conclude that the absence of narrower claims defining the anti-slip drive in more detail was a defect. *TR. Vol. 2–319.* This is because "it [is] a conventional practice, among patent attorneys who prosecute a lot of patent applications, to grade their claims so that they will have a broad claim and then they will have some narrower claims that add additional features of that broad claim." *TR. Vol. 2–320* (statement of B & L counsel Laurence Pretty in which HP expert James Gambrell concurred).

Gambrell completely agreed with B & L counsel that B & L's attorneys could have concluded that the failure to include narrower claims in the '950 patent was reissu-

able error. *Id.* However, Gambrell disagreed with B & L counsel when he suggested that customary practice would have led B & L's attorneys to conclude that the absence of the graded claims was simply "an oversight by the original attorney." *TR. Vol. 2–321.* If B & L simply had told the examiner that less had been claimed than was possible under the allowed claims of the patent and that the error was without deceptive intent, then Gambrell believed that B & L "would have had a legitimate basis to go in and try" to get a reissue. *Id.* But once B & L made affirmative representations, for example suggesting that the inventor and his attorney were guilty of "oversight," B & L had a duty to investigate the statement that "oversight" was involved and determine whether that was true in fact.

Once the Fleming affidavits were obtained, then B & L had an even more specific duty to ascertain whether Fleming's statements were at all corroborated by the other available evidence.[23] In other words, once B & L decided to attempt to explain why the narrower claims were not included in the patent, they had a duty to make a reasonable effort to be certain that the explanation given was factually correct. Because B & L did offer an explanation (first stating simply "oversight," and then adding the "lack of contact" and "lack of guidance" embellishments of the Fleming affidavits) and yet failed to investigate whether this explanation was truthful, Gambrell concluded that B & L had breached its duty of candor and committed inequitable conduct before the PTO.

Raphael V. Lupo testified as an expert on behalf of B & L. The subject area of his expertise was the prosecution of patent applications and reissue applications, and patent litigation practice and tactics. *TR. Vol. 6–996.* Mr. Lupo testified that it is standard practice for patent practitioners

---

**23.** Gambrell stated at one point: "[W]e're talking about a reissue situation, in which you have to establish that the defect occurred by error and without deceptive intent. And that's not just any situation." *TR. Vol. 3–414.*

Gambrell concluded that he "saw no basis for the reissue because the question is whether the

inventor or the patentee committed—had a defective application, specification, claim or what have you, that was—that occurred as a result of an error without deceptive intent...." *TR. Vol. 3–431–32.*

to include a range of broad and narrow claims in patent applications "as a hedge against the possibility that a claim may be found invalid in court. If a broad claim were found invalid in court, the remaining claims are still effective." *TR. Vol. 6-1000.* Also, a range of claims enhances the marketability of a patent because a later purchaser may be able to gain value from the licensing potential of a patent on narrow claims even if the broad claims are no longer of commercial value. *Id.* Lupo testified that he could think of no reason why an attorney would fail to include narrow claims depending from an allowable broad claim. *TR. Vol. 6-1002.* In Lupo's view, the most likely reason for omitting to include narrow claims is "oversight."

Lupo properly observed that the threshold inquiry under 35 U.S.C. § 251 is whether there was a "defect" in the original patent. The next issue is whether the arose through an "error without deceptive intent." *TR. Vol. 7-1026.* Mr. Lupo testified that failure to include narrower claims dependent from the allowable broad claim is a defect for purposes of reissue. *Id.* Such a defect can be determined from the face of the patent. *Id.*

Lupo then testified that an initial inference could be made based solely on the face of the patent whether the defect arose due to an error. *TR. Vol. 7-1027.* In Lupo's view, B & L could have concluded from the file wrapper that the defect resulted from oversight without deceptive intent. The basis for this opinion was Lupo's view that there was no reason for the omission of the intermediate claims; therefore, the omission must have been due to oversight. *TR. Vol. 7-1030.* As to the oversight, Lupo believed that it must have been without deceptive intent: "In my opinion, you have to infer [a lack of deceptive intent] just by looking at the patent itself. You get more information when you go to the file wrapper." *TR. Vol. 7-1071.*

In cross examination, Lupo admitted to having never "examined a mechanical disclosure in my life." *TR. Vol. 7-1056.* He also admitted that the '950 patent is a mechanical disclosure. *Id.* So Mr. Lupo

had absolutely no experience in examining patents such as the '950 patent.

The Court must reject Mr. Lupo testimony on the subject of error and deceptive intent. As a matter of logic, Lupo's position is untenable. After logically explaining why a defect could be obvious—as a technical issue—on the face of a patent, he then jumped to the unsupported assertion that failure to include certain claims must have been an oversight. There is a gap of logic here because Lupo offers no recognition of the fact that the reissue regulations and MPEP require that the party seeking reissue explain why the claims were not included. Lupo's position is a tautology: the inventor failed to include the claims because the inventor failed to include the claims. The point is that to obtain a reissue B & L had the legal responsibility to ascertain why the claims were omitted and to provide that explanation to the examiner. If no explanation could be found, then the examiner should have be so informed. Instead, B & L simply ignored the regulations and told the examiner nothing. When the examiner rejected that, then B & L offered whatever minimal excuse that would suffice, whether it was accurate or not. Lupo's testimony supports the untenable position that reissue always may be obtained simply by looking at the patent and, perhaps, the file wrapper. *TR. Vol. 7-1030.*

The conclusion of Lupo's testimony was that B & L did not commit inequitable conduct. Since B & L "could not know or did not know" about the errors in Fleming's affidavits, "they could not have purposely withheld that from the patent office." *TR. Vol. 7-1051.* The "error is one that is so clear to a reasonable patent attorney that it could be included [sic—concluded] that it was without deceptive intent because there is no conceivable reason that I can think of for not having put those in there." *TR. Vol. 7-1091.* According to Lupo, the reasonable inquiry B & L was required to make pursuant to the regulations of practice before the PTO was satisfied by reading the patent and the file wrapper. *TR. Vol. 7-1086.*

(E) *Conclusions of Law:*

■■■■ B & L and its attorneys had a duty of candor and good faith with respect to its dealings with the PTO during the reissue application process. 37 C.F.R. § 1.56. The duty of candor consists in a responsibility to disclose to the PTO all material information relating to the proceeding in question. *Id.* An integral part of the duty of disclosure is the duty of reasonable inquiry. *See MPEP* § 2001.02. The duty of reasonable inquiry means that an agent or attorney submitting an application to the PTO must make a reasonable effort to verify that representations made in the application are not erroneous. "For instance, if an applicant or applicant's attorney is aware of facts which indicate a reasonable possibility that ... information material to examination may exist, they are expected to make reasonable inquiries to ascertain such information and to submit" it to the PTO. *Id.* This duty continues at least until the time that the application is acted upon. Hence, applicants have a continuous duty to update their applications as information is unearthed. For example, if new information or prior art is discovered casting into doubt the patentability of an invention, the applicant has a duty to submit that information or prior art "with reasonable promptness." *MPEP* § 2002.03(a).

■■■■ In this case, B & L has breached its duty of candor before the PTO by failing to be forthright in its reissue application and by failing to conduct reasonable investigation. There is also a serious question whether B & L failed to update or temporarily withdraw its application when it learned of the serious discrepancies of in Lawrence Fleming's affidavits.

Jonathan Jobe admitted on cross examination that the reissue oath or affidavit is the "guts" of the reissue proceeding and that it is the primary instrument for gaining approval for reissue. *TR. Vol. 4–632.* Nevertheless, Jobe and B & L drafted the original application, in particular the declaration of George More, with a remarkable lack of care. As described in detail above, B & L said that the defect was due to "oversight" but did not tell the examiner

that the basis for this assertion was merely opinion. B & L could have satisfied its duty of candor by simply informing the examiner that it had no information and had done no investigation other than reading the patent and the file history, but in its view there was a defect because any intelligent patent agent would have included narrower claims. Instead, B & L represented to the PTO that the omission was due to "oversight" by the inventor and his agent, even though B & L had no evidence to support the assertion. At a minimum, this was gross negligence.

Once B & L made the affirmative representation that "oversight" occurred, it then had a concomitant duty to make a reasonable investigation to assure the statement's accuracy. Yet, no one from B & L contacted anyone involved in the prosecution of the original patent. B & L did not contact Fleming, Milton Roy, Milton Roy's attorneys in Philadelphia, LDC, LDC President Tarantino, Ronald Ross who was Yeiser's number one assistant, or anyone else who was involved in or who had an interest in the procurement of the '950 patent. Jobe himself only remembers reading the patent itself. *TR. Vol. 4–639* (quoting from deposition testimony of Jonathan Jobe). He read some, though possibly not all, of the file history prior to submitting the application. *TR. Vol. 4–638.* Jobe was not sure whether he read the prior art references cited against the original patent. *TR. Vol. 4–635–37.*

At trial Jobe said he thought he had reviewed the prior art, but at trial HP pointed out that in his deposition testimony Jobe firmly stated that he could not express a view "one way or the other." *Id.* The Court does not find Mr. Jobe credible in his new found recollection. Based on his deposition testimony and the casualness with which B & L approached the reissue application, it is likely that Jobe never reviewed the prior art, or, if he did, he did so without attempting to ascertain whether the prior art bore any relationship to Yeiser and Fleming's ability to stake narrower claims of the sort pursued in the reissue application. In essence, Jobe likely never

considered that Yeiser and Fleming had seen the prior art and decided that it either foreclosed laying claim to narrower specifications, or made such specifications undesirable. Jobe and all the others at B & L never considered investigating whether there was an error because they began from the premise that the patent was defective in not claiming those elements of the invention which B & L then wished to assert against HP and others. *TR. Vol. 4-649-50.* In their minds, the existence of the "defect" was equivalent to an error, *TR. Vol. 4-651* (Jobe testimony); *TR. Vol. 5-788* (Robbins testimony), which is precisely what their expert testified. *See TR. Vol. 7-1027-30* (Lupo testimony).

This leads to the question of whether B & L ever investigated to determine whether there was reissuable error, i.e., whether the defect was due to an error that was susceptible of correction through reissue. B & L's position at trial was that there was no duty in this regard because the defect was so blatantly obvious. Even on direct examination, B & L officials refused to acknowledge the distinction between a defect and a reissuable error. *See TR. Vol. 5-823* (testimony of Howard Robbins: "I am just trying to understand the question.") In direct testimony, Howard Robbins stated that the basis for his belief that the '950 patent was reissuable due to error was because "it appeared to me the applicant had claimed less than the applicant had a right to claim in the original Yeiser '950 patent." *TR. Vol. 5-722.* Properly describing this statutory defect as a "failure" rather than an error, B & L's attorney tried to inquire whether the "failure was a result of error or not?" *Id.* Robbins' response was to state that on the face of the patent he was able to determine that the omission of material that could have been

claimed "was reissuable error." *TR. Vol. 5-723.* In implicitly explaining his unwillingness to separate the concept of a defect from the error that caused it, as is described in the statute, Robbins stated that "a reasonably prudent patent practitioner would have included those further characterizations of the driving mechanism dependent from claim 1." *Id.*

The point missed by Robbins and others at B & L is that what was "reasonable" for Yeiser and Fleming at the time is inevitably a function of the prevailing circumstances. Without any idea of the circumstances in which the original patent was obtained, B & L's reissue application was submitted with reckless indifference to the statutory requirements. B & L did not know and did not care whether an error had been made; there was a defect and a need for reissue and any sort of averment of error was adequate.

The Court must reject this logic and this approach because it does violence to the purpose and spirit of the reissue statute. The requirements for reissue are quite clearly stated in the regulations. The requisite elements for the oath requirement are also clearly articulated in 37 C.F.R. § 1.175 and are augmented by the MPEP § 1404.03. Case law further evinces that "not every event or circumstance that might be labeled "error" is correctable by reissue." *In re Weiler,* 790 F.2d 1576, 1579 (Fed.Cir.1986). The Federal Circuit has emphasized that the reissue statute is not a "panacea" for all prosecution mistakes or a "grant to a patentee of a second opportunity to prosecute *de novo* his original application." *Id.* at 1582. Thus, plaintiff's expert James Gambrell is correct in stating that B & L's views of the '950 patent were irrelevant.[24] The real issue

---

**24.** It is obvious that Mr. Gambrell read *Weiler* with care, for his testimony is fully consistent with the court's ruling. For example, as quoted earlier, Gambrell stated at one point: "[W]e're talking about a reissue situation, in which you have to establish that the defect occurred by error and without deceptive intent. And that's not just any situation." *TR. Vol. 3-414.* In another portion of his testimony, Gambrell stated:

Reissue applications are not permitted to allow you to reargue whether you have the proper coverage for your invention. That's not the purpose of the reissue. You have to find a defect that was caused by an error without deceptive intent and if Mr. Yeiser got the kind of claims he wanted, that's all he's entitled to and he's not entitled to go back and reissue for that reason just because somebody

was whether Yeiser and Fleming were satisfied:

> [W]hen you're talking about the scope of claims, the question whether there are narrower claims and whether that defect occurred as a result of error without deceptive intent, is inherently and importantly a question which is devoted and directed to the inventor and patentee who is the person who is claiming and obtaining the patent.
>
> And so, therefore, what you need to know is what Yeiser felt was defective, if anything, and whether that was an error on his part; not whether you go back and look and say, "Gee, I would like to have claims on another feature or another aspect of this invention."
>
> That's not enough for reissue. The question is: did Yeiser find a defect or would he have felt there was a defect that occurred through error without deceptive intent?

*TR. Vol. 3–431–32.*

No one at B & L knew whether claims of the character of reissue claims 10–12 had been considered by Yeiser or Fleming. *TR. Vol. 4–652* (testimony of Jonathan Jobe). In filing the original reissue application, B & L was not concerned with the details of the original patent prosecution; they simply wanted the reissue. B & L spoke to no one. *TR. Vol. 4–653* (testimony of Jonathan Jobe). B & L did not contact Fleming. B & L did not contact the original assignee of the patent, LDC. B & L did not contact the original owner of the patent by assignment from LDC, Milton Roy. B & L did not contact Milton Roy's attorney in Philadelphia who had monitored Fleming's prosecution of the patent. B & L did not seek out or speak to Fleming's number one assistant, Ronald Ross. B & L did not speak to Yeiser's wife Patsy or to any of his professional associates or personal friends who might have information regarding the conduct of the original patent proceedings.

Worse still, when they were told by the examiner to contact the original patent agent, they did not once ask him whether he or Yeiser had considered adding narrower or intermediate claims to the '950 patent application. Once again, B & L was determined to obtain a reissue and was not concerned about whether its representations corresponded to the actual reality. B & L clearly breached its duty to make a reasonable investigation of its representations.

There is also a serious question whether B & L breached its duty to provide the PTO with information contradicting its reissue application. Defendant's expert Rafael Lupo testified that the whole patent system depends on the good faith candor of the attorneys prosecuting cases before the PTO. *TR. Vol. 7–1075.* When an attorney breaches the duty of candor, inequitable conduct has been committed. *Id.* Lupo also admitted, and the facts are clear on this, that when B & L investigator Bill Ellis met with Lawrence Fleming in September 1984, the reissue application was still pending. At that meeting, Ellis may have learned, if he did not already know, that Fleming had several volumes of notebooks kept during the relevant time period of the original patent application. Nonetheless, B & L did nothing. It neither examined the notebooks nor asked for a stay of its application pending review of the notebooks.

There is a gap in HP's case on this point because it never established that B & L knew about the notebooks as a result of the September 1984 meeting between Ellis and Fleming. The reference to the notebooks in Fleming's notes of that meeting is plain, but HP did not establish that B & L saw Fleming's notes or that Fleming told Ellis about the notebooks. Thus, it might be the case that B & L truly did first learn of the existence of the notebooks during a deposition of Mr. Fleming taken in this litigation.[25] A contrary inference is also

---

else has decided in hindsight that they would like to have some other kinds of claims. *TR. Vol. 3–427.*

**25.** Of course, this would not mitigate B & L's breach of its duty to investigate by failing to

inquire about something as obvious as a patent agent's time notebooks, but it would eliminate a duty to report contrary information learned during the pendency of the reissue application.

possible. Considering that the burden of proof was on HP, the Court concludes that B & L was not apprised of the existence of the notebooks as a result of the September 1984 meeting between Fleming and Ellis.

■ B & L's knowledge about the notebooks leads to consideration of B & L's state of mind throughout the reissue proceeding. As discussed above, the Federal Circuit in the *FMC Corp.* stressed that good faith intent is a complete rebuttal to the affirmative defense of inequitable conduct. The Court was able to hear the testimony of four of the principle actors for B & L in the reissue proceedings, including Lawrence Fleming, Jonathan Jobe, Howard Robbins, and Bernard Bogdon. In one way or another, each of the individuals averred a good faith intent during the reissue application process. On this point, defendants received partial support from plaintiff's expert Gambrell who stated that he saw "nothing that shows they were intentionally trying to be dishonest." *TR. Vol. 3–381.*

When all the evidence is added up, however, all that defendants have are mere denials of intent to mislead. Pursuant to *J.P. Stevens* and *FMC Corp.*, this is not enough. At every step of the reissue process, B & L refrained from exerting any but the least effort in determining the truth. "Studied ignorance" is perhaps the best way to describe B & L's position. B & L's attorneys sought to know as little as possible about the original application proceeding. They ignored the reference in the file history of the '950 patent to the existence of commercial embodiments of the mechanism when Fleming told them he had only a crude model. They made a representation of "oversight" that was "without deceptive intent" when they had absolutely no idea whether the statement was true. When directed by the examiner to obtain the statement of the original patent agent, they did so, but under circumstances wherein the agent was *told* he had made an error and asked for some rationalizations. Moreover, in eliciting the rationalizations both B & L attorneys were fastidiously careful not to ask crucial, almost painfully obvious questions about the original patent

application. And despite the fact that the patent agent was an elderly man being asked to recall events transpiring a decade before, B & L never undertook to confirm any facts provided by Mr. Fleming. In short, the entire process was antiseptically clean and devoid of even a hint of dirt having been dislodged in the investigation. The duty of candor and good faith is not so easily discharged. B & L has not demonstrated that it acted in good faith and the witnesses' testimony is not credible on that subject.

For the reasons described above, the Court concludes that B & L committed inequitable conduct in procuring the Yeiser reissue patent. The Court cannot conclude that the attorneys acted in good faith. Therefore, the nine remaining claims of the reissue patent which correspond to the original '950 patent are hereby declared unenforceable.

## V. CONCLUSION.

All twelve claims of the Yeiser reissue patent are void. Claims 10–12 are invalid because they were obtained in contravention of the statutory and regulatory requirements. Claims 1–9 of the Yeiser reissue patent, which are the original nine claims of the '950 patent, are unenforceable due to the inequitable conduct of B & L during the reissue application process.

IT IS SO ORDERED.